DAYTON NEWSPAPER, INC., DBA THE JOURNAL HERALD, ET AL., APPELLANTS, *v.* THE CITY OF DAYTON, ET AL., APPELLEES.

(No. 3645—Decided June 4, 1971.)

*Messrs. Estabrook, Finn & McKee,* for appellants.

*Mr. James W. Drake,* city attorney and *Mr. Edward M. Taylor, Jr.,* for appellees.

CRAWFORD, J. Plaintiffs, a newspaper publisher and its reporter, appellants herein, complain of private meetings

of the defendants, commissioners of the city of Dayton, appellees herein, to which meetings plaintiffs were denied admittance. The prayer of the petition is for a declaratory judgment, and a permanent injunction enjoining defendants from denying plaintiffs access to any meetings of the city commissioners. Plaintiffs bring the action on behalf of themselves, all affected news media, and all citizens and taxpayers of the defendant city.

The case in its inception had particular reference to an investigation of a dispute involving the termination of the employment of the airport operations superintendent. That particular subject, no longer having news value, has been abandoned. Yet the general relief is still being sought.

The Court of Common Pleas denied relief. Plaintiffs have appealed on questions of law and fact. However, the facts are not in dispute. The issue is whether the defendant commissioners may get together privately, excluding the news media and the public.

The city of Dayton operates under a charter as provided for in the Ohio Constitution, Section 7, Article XVIII, which reads:

"Any municipality may frame and adopt or amend a charter for its government and may, subject to the provisions of section 3 of this article, exercise thereunder all powers of local self-government. (Adopted September 3, 1912.)"

Section 3, Article XVIII provides:

"Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws. (Adopted September 3, 1912.)"

The city charter, therefore, becomes a document of prime importance in the present controversy. The following provisions thereof deserve careful scrutiny:

Section 1:

"* * * The city shall have all powers that now are, or hereafter may be granted to municipalities by the constitution or laws of Ohio; and all such powers, whether ex-

pressed or implied, shall be exercised and enforced in the manner prescribed by this charter, or when not prescribed herein, in such manner as shall be provided by ordinance or resolutions of the Commission.''

Section 2:

''The enumeration of particular powers by this charter shall not be held or deemed to be exclusive, but, in addition to the powers enumerated herein, implied thereby or appropriate to the exercise thereof, the city shall have, and may exercise, all other powers which, under the constitution and laws of Ohio, it would be competent for this charter specifically to enumerate.''

Section 3:

''* * * The Commission shall constitute the governing body with powers as hereinafter provided to pass ordinances, adopt regulations * * * and exercise all powers hereinafter provided.''

Section 39:

''At ten o'clock A. M. on the first Monday in January, following a regular municipal election, the Commission shall meet at the usual place for holding the meetings of the legislative body of the city, at which time the newly-elected Commissioners shall assume the duties of their office. Thereafter the Commissioners shall meet at such times as may be prescribed by ordinance or resolution, except that they shall meet not less than once each week. The Mayor, any two members of the Commission, or the City Manager, may call special meetings of the Commission upon at least twelve (12) hours' written notice to each member of the Commission, served personally on each member or left at his usual place of residence. All meetings of the Commission shall be public and any citizen shall have access to the minutes and records thereof at all reasonable times. The Commission shall determine its own rules and order of business and shall keep a journal of its proceedings.''

Section 46:

''The Commission, or any committee thereof duly authorized by the Commission so to do, may investigate the

financial transaction of any office or department of the city government and the official acts and conduct of any city official, and by similar investigations may secure information upon any matter * * *."

Section 91 of the Code of General Ordinances provides: "All meetings of the Commission shall be public."

The question naturally arises, what is a "meeting." Black's Law Dictionary (4th ed. 1968) says it is as follows:

"A coming together of persons; an assembly. Particularly, in law, an assembling of a number of persons for the purpose of discussing and acting upon some matter or matters in which they have a common interest "

Bouvier's Law Dictionary (8th ed. 1914) defines it as follows:

"A number of people having a common duty or function, who have come together for any legal purpose, or the transaction of business of a common interest; an assembly."

It appears, therefore, that a meeting is an occasion for the transaction of business, and the term is generally so used in the law. It is for this reason that certain formalities must be observed and specified procedures followed, in order to assure the regularity and legality of any action taken. Among these requirements are a fixed schedule for regular meetings and adequate notice of special meetings. The actual transaction of public business must be done publicly, not secretly.

The present issue, however, concerns gatherings of commissioners when no business is transacted; when, rather, they confer together and with each other; and when they collaborate in doing what may be called their "homework." It is important that they do so freely and without restraint. Like all who have the responsibility of making important decisions, they need an opportunity to express, exchange and test ideas, to deliberate freely, off the record, and without the restraint of outside influence. Freedom of discussion and the exchange of ideas is essential to an understanding of a problem. It cannot be satisfactorily accomplished under a spotlight or before a microphone.

Such a procedure is widely and necessarily practiced in various branches of government. After an open public trial, the jury is required to deliberate in privacy. A grand jury, whose duty is investigative, must proceed in strict secrecy, for vital and evident reasons. Ours, like any multiple court, regularly withdraws from the public court-room to deliberate uninterruptedly in chambers The President or Governor meets privately with his cabinet; so likewise do other public officials with their advisors. So do business men, who sometimes call the process "brainstorming." The brief of one party to this action uses the term "policy sessions."

This is a needful and constructive process of government, even in a democracy. It is conducive to clear thinking, which could easily be stifled by premature publicity.

This principle was expressed by the legislature in the enactment of R. C. 121.22, wherein it recognized and approved the practice of holding executive sessions in which no business is actually transacted. It reads in part, as follows:

"Meetings of governmental bodies to be public; exception.

"All meetings of any board or commission of any state agency or authority and all meetings of any board, commission, agency or authority of any county. township, municipal corporation, school district or other political subdivision are declared to be public meetings open to the public at all times. No resolution, rule, regulation or formal action of any kind shall be adopted at any executive session of any such board, commission, agency or authority."

The charter of the city of Dayton does not expressly provide for executive sessions, but neither does it forbid them. The provision for them in R. C. 121.22 is made applicable by sections 1 and 2 of the charter already quoted above.

This court recognized the applicability of R. C. 121.22 to executive sessions of a board of education in *State, ex rel. Humphrey,* v. *Adkins* (1969), 18 Ohio App. 2d 101. An excellent definition of an executive session is to be found

in *Thomas* v. *Board of Trustees* (1966), 5 Ohio App. 2d 265, in these words found in paragraph three of the syllabus:

"An executive session is one from which the public is excluded and at which only such selected persons as the board may invite are permitted to be present. The test is not who is present at the meeting, but whether the meeting is open to the public."

In the much quoted case of *Beacon Journal Publishing Co.* v. *Akron* (1965), 3 Ohio St. 2d 191, municipal boards and commissions other than the city council were involved, and there was a city ordinance which apparently followed closely the provisions of R. C. 121.22. Nevertheless, the following language from the Supreme Court's opinion, at pages 198, 199, clearly covers the situation now before us:

"Under the charter, Section 98, the members of the board of directors of the municipal university '* * * have all the powers and duties now or hereafter provided for by the state law.' Thus, this board is subject to the provisions of Section 121.22, Revised Code.

"* * * *

"The council of the city of Akron and the General Assembly have not prohibited executive sessions of any board or commission."

Of interest also is the following language from the opinion:

"It is clear that the public has no common-law right to attend meetings of governmental bodies. See Open Meeting Statutes: The Press Fights for the 'Right to Know,' 75 Harvard L. Rev. 1199, 1203 (March 1962).

"Therefore, any right the public has to attend meetings of the governmental bodies referred to in this cause must arise by reason of the provisions of the ordinance or the statute which have been referred to here.

"An examination of both the statute (Sec. 121.22 R. C.) and the ordinance reveals that the second sentence in both the ordinance and the statute limits the first sentence in each; otherwise there would be no reason for the second sentence in each. Therefore, it must be concluded that both the council and the General Assembly clearly intended

that those meetings which are required to be open to the public are *all meetings of any board or commissions, where any resolution, rule, regulation or formal action of any kind shall be adopted or passed.*"

R. C. 121.22 having been made applicable to the city of Dayton by virtue of sections 1 and 2 of the charter, the same result must follow here.

The evidence shows that the charter has been consistently so interpreted and followed over a period of many, many years. This fact in itself has great efficacy in supporting the conclusion we have reached. 50 Ohio Jurisprudence 2d 253, Statutes, Section 268.

Plaintiffs point out that the airport matter was an investigation, as provided in section 46 of the charter. They call attention to sections 124 to 129 inclusive of the code of general ordinances, outlining the procedures for investigation. They emphasize particularly the provisions in section 129 that the commission or any committee or person authorized to make an investigation "shall make a full and complete report of its proceedings, together with its recommendations to the city commission," or, in certain instances, to the city manager. They reason that the requirement of a report renders the investigation a public meeting.

This is a *non sequitur.* The words of the ordinance make it plain that the investigator or investigators are to take no action, but merely make a recommendation to be acted upon by others. Hence, the investigation, even if conducted by the entire commission, does not involve a meeting at which any action is taken.

In support of their argument on this point, plaintiffs quote these words from the opinion in the *Beacon Journal case, supra* at page 199:

"This means that at any session of a board or commission subject to the ordinance or the statute, where any action is taken, which action is required by law, rule or regulation to be recorded in the minutes, the journal or any other official record of the board or commission, such session is a meeting which must be open to the public."

That language defeats the argument, for in addition to the making of a record, designated as "minutes," it specifies a session "where any action is taken," which *action* is to be recorded. Action is the distinguishing characteristic of a "meeting," as we noted at the outset.

The opinion of Judge McBride at the first trial of this case in the Court of Common Pleas appears in 23 Ohio Misc. 49. The law is clearly stated in the five paragraphs of the syllabus. It would be redundant to repeat them here.

This controversy is but a local phase of the constant conflict between the news media and the public on the one hand and various agencies of government on the other. Secrecy which serves the public interest should be observed: that which does not should be avoided. The distinction between the two may sometimes be difficult to draw. But unless there is an abuse of the required discretion, the courts may not interfere.

The injunction will be denied.

*Judgment affirmed.*

KERNS and YOUNG, JJ., concur.