The MAYOR & CITY COUNCIL of
El Dorado *v.* EL DORADO BROADCASTING
COMPANY and Carl CONNERTON

76-99                                    544 S.W. 2d 206

Opinion delivered December 20, 1976
(In Banc)

822

*J. V. Spencer, III,* City Atty., for appellants.

No brief for appellee.

CONLEY BYRD, Justice. Following some complaints by the black residents of the City of El Dorado about the use of federal revenue funds, the mayor held a conference in his office, at which four of the city's eight aldermen were in attendance, together with the city attorney and a man from the Mediation Service of the U.S. Department of Justice. Carl Connerton, a news reporter, was refused admittance to that conference. The record indicates that as a result of that meeting the city attorney was directed to prepare a resolution for the next formal city council meeting. The trial court entered a declaratory judgment to the effect that a meeting of any number, less than a quorum, of the members of the city council is subject to the Freedom of Information Act if the members of the council discuss, or take action on any matter on, which foreseeable action will be taken. The trial court's order also emphasized that the Freedom of Information Act did not apply to meetings of any number of the city council for purposes of only obtaining information. The city councilmen appeal contending that the Freedom of Information Act should not be applied to a group of individual members of a governing body, less in number than a quorum, who meet either formally or informally on a matter on which foreseeable action might be taken, and who are not delegated on behalf of the governing body to perform any function whatsoever. In other words, appellants contend that the Freedom of Information Act should not be extended past the "Committee" level envisioned in *Arkansas Gazette Co.* v. *Pickens,* 258 Ark. 69, 522 S.W. 2d 350 (1975). We cannot agree with appellants.

Ark. Stat. Ann. § 12-2802 (Repl. 1968), provides:

"12-2802. Declaration of public policy. — It is vital in a democratic society that public business be performed in an open and public manner so that the electors shall be advised of the performance of public officials and of the decisions that are reached in public activity and in making public policy. Toward this end, this act [§§ 12-2801 — 12-2807] is adopted, making it possible for them, or their representatives, to learn and to report fully the activities of their public officials. [Acts 1967, No. 93, § 2, p. 208.]"

Ark. Stat. Ann. § 12-2805 provides:

"12-2805. Open public meetings. — Except as otherwise specifically provided by law, all meetings formal or informal, special or regular, of the governing bodies of all municipalities, counties, townships, and school districts, and all boards, bureaus, commissions, or organizations of the State of Arkansas, except Grand Juries, supported wholly or in part by public funds, or expending public funds, shall be public meetings."

In discussing informal meetings the Court in *Sacramento Newspaper Guild* v. *Sacramento County Board of Supervisors*, 69 Cal. Rptr. 480, 263 Cal. App. 2d 41 (1968) stated:

". . . An informal conference or caucus permits crystallization of secret decisions to a point just short of ceremonial acceptance. There is rarely any purpose to a nonpublic pre-meeting conference except to conduct some part of the decisional process behind closed doors . . . ."

In the *Gazette* case, *supra*, we pointed out:

". . . When the General Assembly used the expression 'to learn and report *fully* [our emphasis] the activities of their public officials', it meant not only the action taken on particular matters, but likewise the reasons for taking that action. . . ."

The Freedom of Information Act applies alike to formal

and informal meetings and since we are required to give the Act a liberal interpretation, we cannot agree with appellants that it applies only to meetings of officially designated committees. We can think of no reason for the Act specifying its applicability to informal meetings of governmental bodies unless it was intended to cover informal but unofficial group meetings for the discussion of governmental business as distinguished from those contacts by the individual members that occur in the daily lives of every public official. Any other construction would obliterate the word "informal" as applied to meetings and make it simpler to evade the Act than to comply with it.

It has been suggested that the judgment appealed from is too far reaching in that it would apply to any chance meeting of any two members of a governmental agency or body. The suggestion that the trial court's order is too broad has not been raised by the appellants. The appellants' argument as set forth in their conclusion is as follows:

"It is respectfully submitted that the laudatory purpose of our Freedom of Information Act would be protected and the public interest best served if the Act were not judicially extended to meetings of members of a governing body, not a committee, and less in number than a quorum, who discuss a matter on which foreseeable action might be taken. Certainly, such a group could not take 'official action,' nor could they bind the governing body in any way. Their actions would be limited, by operation of law, only to discussions."

Furthermore, we do not interpret the trial court's judgment as applying the Freedom of Information Act to a chance meeting or even a planned meeting of any two members of the city council. By its very terms the trial court's order applies only to those group meetings such as the facts here showed — i.e. any group meeting called by the mayor or any member of the city council at which members of the city council, less in number than a quorum meet for the purpose of discussing or taking any action on any matter on which foreseeable action will be taken by the city council.

Affirmed.

HARRIS, C.J., and FOGLEMAN, J., dissent.

CARLETON HARRIS, Chief Justice, dissenting. I would affirm the judgment, if modified to confine the holding to the particular facts of this case, which I consider to be in violation of the Freedom of Information Act. However, the opinion, in my view, goes much further, and I accordingly dissent.

JOHN A. FOGLEMAN, Justice, dissenting. My task would be easier if I could be certain exactly what the majority has held. The judgment of the lower court is affirmed. The majority states that it held that a meeting of any number less than a quorum of the members of the City Council of El Dorado is subject to the Freedom of Information Act, if the members of the council discuss, or take action on any matter on which foreseeable action *will* be taken. Then by invisible legerdemain, it does not construe the judgment to apply to any *two* members of the city council. And then it says that by its very terms the trial court's order applies only to those group meetings *called by the mayor* or *any member of the city council, less in number than a quorum,* for the purpose of discussing or taking any action on any matter on which foreseeable action will be taken by the council. No two of the three statements relating to the court's holding are consistent with each other.

I would first suggest that we should modify the court's judgment so that it applies to the facts of the particular controversy only. That related to a meeting called by the mayor, with four of eight council members and the city attorney present. It is a fair inference that the preparation of a resolution for action by the council was the direct result of this meeting, although the proposition is not without dispute. If the only question involved was whether there was substantial evidence to support a finding that the particular meeting involved violated the Freedom of Information Act, I would agree that the judgment should be affirmed. Anything beyond that was an advisory opinion, the giving of which is consistently shunned by this court and beyond the purposes of the Declaratory Judgment Act. *Andres* v. *First Arkansas Development Co.,* 230 Ark. 594, 324 S.W. 2d 97. I submit that the action

taken here is subversive of the salutary purposes of the Declaratory Judgment Act. Such a result could, and should, be easily avoided.

The purpose of the Declaratory Judgment Act was considered in *Andres*. There it was pointed out that the requisite precedent condition to declaratory relief is a justiciable controversy, i.e., a controversy in which a claim of right is asserted against one who has an interest in contesting it. It was also emphasized that a declaratory judgment should not be granted unless the danger or dilemma of the plaintiff is present, not contingent upon the happening of hypothetical events, and that the prejudice to his position is actual and genuine, and not merely possible, speculative, contingent and remote. Whatever the reasons for not responding, appellees' failure to file a brief here is clearly indicative that they have no present danger or dilemma and that any issue, beyond the propriety of the meeting actually held, which gave rise to the controversy, is contingent, indeed, upon the happening of hypothetical future events. It also makes their prejudice appear to be highly speculative, contingent and remote.

The court before which a proceeding is pending cannot enlarge the issue beyond those raised by the pleadings. *Weber v. Pryor*, 259 Ark. 153, 531 S.W. 2d 708. Both the trial court and this court have extended the issues. The appellees, who did not even favor us with a brief, and who have not pursued their cross-appeal,[1] had requested notice of the following:

1. Any and all meetings of any officially designated committee of the City Council of El Dorado, Arkansas.

2. Any meeting called by the Mayor or any member of the City Council at which members of the City Council, less in number than a quorum, who do not constitute a committee of the City Council, meet for the *sole* purpose of discussing matters or receiving information pertaining to the public business of the City of El Dorado, Arkansas. [Emphasis mine.]

3. Any time the Mayor requests as many as four

---

[1]Certainly the cross-appeal should be dismissed.

members of the City Council plus the Mayor to meet in the Mayor's office for the purpose of receiving a report or information from any representative of a federal or state governmental agency, which report or information pertains to the public business of the City of El Dorado.

The city recognized appellees' entitlement to notice in accordance with Item 1 but not Items 2 and 3.

The point relied on by appellants for reversal is:

A MEETING OF LESS THAN A QUORUM OF A GOVERNING BODY, NOT DESIGNATED BY THE GOVERNING BODY AS A COMMITTEE AND NOT AUTHORIZED COLLECTIVELY IN ANY MANNER WHATSOEVER TO ACT FOR THE GOVERNING BODY, WHO DISCUSS, OR ATTEMPT TO "TAKE ACTION" ON ANY MATTER ON WHICH FORESEEABLE ACTION WILL BE TAKEN BY THE GOVERNING BODY, IS NOT A "MEETING" WITHIN THE MEANING OF THE FREEDOM OF INFORMATION ACT OF THE STATE OF ARKANSAS.

Not only does the majority, in saying that appellant did not argue that the trial court order was too broad, overlook the statement of the only point urged for reversal, it totally ignores a vital part of appellant's argument, viz:

The ruling of the lower court (T. 68) would in effect, extend the Freedom of Information Act past the "committee" level envisioned by this court in the *Gazette* case into an area which would place a discussion of a public issue on which foreseeable action is contemplated, between two or more members of a governing body, not constituting a committee and less than a quorum, and not authorized collectively in any matter whatsoever to act for the governing body, to be directly within the purview of the Freedom of Information Act.

The appellants certainly agree that "public business should be performed in an open and public

manner," but it is also certainly true that a group of aldermen less in number than a quorum and not constituting a committee have no authority to "perform" public business. As the California Supreme Court said in *Adler* v. *City Council of Culver City*, 7 Cal. Rpts. 805 (1960), such a gathering is not a "meeting" in the legal sense. The California Supreme Court goes on to point out:

"As stated by one of the text-writers, 'the general rule is that, to bind the municipality, the council or legislative body must be duly assembled and act in the mode prescribed by the law of its creation, evidenced by an order entered by record, and such act, if legislative in character, must ordinarily be by ordinance, by-law or resolution, or something equivalent thereto.' *McQuillin, Municipal Corporations*, 2d Ed., Vol. 2, Section 602, p. 529. Unless, therefore, the members of the council formally come together, in the manner required by law, for the purpose of joint discussion, decision and action with respect to municipal affairs there can be no 'meeting' of this governing body within the legally accepted sense of the terms, for the individual or separate acts of a member or the unofficial agreements of all or a part of the members of the council are ineffectual and without binding force; joint, official deliberation and action as provided by law being essential to give validity to the acts of the council."

\* \* \*

Certainly officially delegated committees of the city council are covered by the act under the authority of the *Gazette* case, because they are an "alter ego" of the "governing body," authorized by the governing body to fulfill certain functions. Ark. Stats. Anno. 12-2805 states as follows:

Except as otherwise specifically provided by law, all meetings formal or informal, special or regular of the *governing bodies* of all municipalities . . . should be public meetings.

This Court found in the *Gazette* case that this act applied to committees of "governing bodies" under the rationale that a "parent body could divide itself into groups of small committees, each member of the committee thus having a chance to commit himself concerning a matter on which foreseeable action would be taken by the parent authority." Under the *Gazette* case, the parent body could not form small committees which can meet in closed session. Such an attempt would be illegal.

The pivotal and distinguishing feature between the *Gazette* case and the interpretation of the act by the lower court is that the *Gazette* case dealt with an officially delegated "committee" of the "board" and the court is here concerned with, not a "committee," but a group of individual members of a governing body, less in number than a quorum, who meet either formally or informally on a matter on which foreseeable action might be taken, but who are not delegated on behalf of the "governing body" to perform any function whatsoever on behalf of the governing body. Certainly, such a strained construction of the Act to cover such a situation is far beyond the liberal rule of construction applied in the interpretation of this act, \*\*\*\*\*

No application of this or any similar act has been so far reaching. The hypothetical meeting of less than a quorum dealt with in the majority opinion would not be a committee, would not be authorized to take or recommend any action and may meet for purposes in addition to discussion of matters on which "foreseeable action" will be taken. I fail to see how any decision binding either on the city council or the participants could have been made at the gathering proscribed by this opinion. I cannot escape the conclusion that the majority has not read the act beyond its first section, the declaration of public policy. Then the majority has undertaken to usurp a legislative function, i.e., implementation of the policy declared by creating the "foreseeable action" requirement. A meeting must fall within a classification of legality or illegality at the time it is held. This act carries criminal penalties for violation. This "if so" "then so" interpretation has serious constitutional implications.

By applying the majority interpretation, it will never be necessary to decide whether there was a "meeting," so long as three (or is it two?) members participate at the behest of one of them. Or can two members do just anything without violating the act? Just what "action" by councilmen constituting neither a committee nor a majority of the city's governing body is, I don't suppose will ever be defined. And what does "taking any action on any matter on which foreseeable action will be taken by the city council" mean? For that matter what is the meaning of "foreseeable action will be taken"? If the action is foreseeable, then what is the significance of the minority's "action"?

I submit that the majority's construction of the act cannot be found anywhere in its language, even by inference. I daresay that the most ardent advocate of the Freedom of Information Act never dreamed that its scope could possibly be taken to be so extensive or confused. If the act is so comprehensive, it was a foolish extravagance to waste so much judicial time and talent in arriving at the conclusion that a meeting of a committee of a governing board must be a public meeting in *Arkansas Gazette Company* v. *Pickens,* 258 Ark. 69, 522 S.W. 2d 350.

In my concurring opinion in the *Pickens* case I observed that the extension of the act, to cover meetings of committees which were less than a quorum and did not have authority to act, was accomplished by rhetoric rather than reason. Here, I find both missing. I find only judicial legislation amending the Freedom of Information Act. By it the court has extended the scope of the act beyond any statutory or judicial decision in any jurisdiction. In the most extreme position taken by any other court prior to the decision of this court in *Arkansas Gazette Co.* v. *Pickens,* supra, an intermediate court in Florida, in *Bigelow* v. *Howze,* 291 So. 2d 645 (1974) said:

> We do not suggest that the committee cannot interview others privately concerning the subject matter of the committee's business or discuss among itself in private those matters necessary to carry out the investigative aspects of the committee's responsibility. Cf. *Basset [Bassett]* v. *Braddock,* Fla. 1972, 262 So. 2d 425.

However, at the point where the members of the committee who are also members of the public body make decisions with respect to the committee's recommendation, this discussion must be conducted at a meeting at which the public has been given notice and a reasonable opportunity to attend.

The proper application of the "public meetings" provision is expressed in *McLarty v. Board of Regents*, 231 Ga. 22, 200 S.E. 2d 117 (1973) thus:

*** It applies to the meetings of the variously described bodies which are empowered to act officially for the State and at which such official action is taken. Official action is action which is taken by virtue of power granted by law, or by virtue of the office held, to act for and in behalf of the State. The "Sunshine Law" does not encompass the innumerable groups which are organized and meet for the purpose of collecting information, making recommendations, and rendering advice but which have no authority to make governmental decisions and act for the State. What the law seeks to eliminate are closed meetings which engender in the people a distrust of its officials who are clothed with the power to act in their name. It declares that the people, who possess ultimate sovereignty under our form of government, are entitled to observe the actions of those described bodies when exercising the power delegated to them to act on behalf of the people in the name of the State. ***

I feel so strongly about the matter that I am compelled to repeat a part of my concurring opinion in *Arkansas Gazette Co. v. Pickens*, supra when I said:

It can be argued with considerable force that the result of the extension made here is an impediment to informal discussions and exchange of information among committee members, and consultation by them with experts or informed individuals having special qualifications to speak upon problems being investigated by the committee. There is an appropriate in-

vestigative and exploratory stage preceding many actions by governmental bodies and agencies. At this stage, it may be said there are advantages to the public in permitting preliminary discussions in which there can be greater freedom of expression without fear of benefitting special interests, harming reputations, inviting pressure from special interests, creating a public image of ignorance by searching questions, producing demagogic oratory, exposing disagreements of subordinates with policy determinations they must administer, or "freezing" members into publicly expressed opinions they might well prefer to abandon. In such initial stages, it is well that much be done and said which is exploratory, experimental and hypothetical and open meetings could prove to be an impediment to a free exchange of ideas of that sort. See Open Meeting Statutes: The Press Fights for the "Right to Know," 75 Harvard Law Review 1199, 1202, 1219 (1962). The writer of that article, an advocate of the extension of Freedom of Information Acts, demonstrates that a policy determination is involved in this language found at p. 1206:

> . . . Whether the courts will construe less explicit statutes as applying to subordinate committees and agencies is problematical. Since such groups have no power to make governmental decisions and since their recommendations must be considered in open session by the parent body, the need for public meetings is less compelling; indeed, privacy may facilitate the gathering of information as well as preliminary discussion. But if in practice recommendations are adopted with only perfunctory consideration by the parent group, the public will be deprived of information about the actual process of decision. And since there seems to be no particular reason for leaving subordinate groups always free to meet in private, the preponderant interest in informing the public seems sufficient to justify their inclusion.

Likewise, an Ohio court has recognized the impossibility of satisfactory accomplishment of the desired freedom of discussion and exchange of ideas essential to clear un-

derstanding and thinking under a spotlight or before a microphone. *Dayton Newspapers, Inc.* v. *City of Dayton,* 28 Ohio App. 2d 95, 274 N.E. 2d 766 (1971).

Public policy matters are involved. Fundamentally, the legislative branch declares public policy. If the common law is to be changed by extension of the Freedom of Information Act to all committees of every public board, commission, agency, organization or governing body, it should be done, as it was in California and New Jersey, by the General Assembly. See Sacramento *Newspaper Guild* v. *Sacramento Co. Bd. of Supervisors,* 263 Cal. App. 2d 41, 69 Cal. Rptr. 480 (1968); Comment, Access to Government Information (Blum), 54 California Law Review 1650, 1653 (1966); *Wolf* v. *Zoning Board of Adjustment of Park Ridge,* 79 N.J. Super. 546, 192 A. 2d 305 (1963). The great disadvantage in courts' attempting to declare public policy lies in the fact that attention is necessarily focused on the particular interests of the litigants. In contrast, the legislature has the advantage of having all perspectives presented and considered in making such determinations. This determination should have been left with the General Assembly where it belongs, both as a policy decision and as a change in the common law. Even the Florida Supreme Court has finally recognized the hazards of "judicial implementation." *Bassett* v. *Braddock,* Fla., 262 So. 2d 425 (1972).

See also, Comment, Access to Governmental Information in California, (Blum) 54 California Law Review 1650, 1651, 1655 (1966).

In *Bassett,* the Florida Supreme Court said:

Every action emanates from thoughts and creations of the mind and exchanges with others. These are perhaps "deliberations" in a sense but hardly demanded to be brought forward in the spoken word at a public meeting. To carry matters to such an extreme approaches the ridiculous; it would defeat any meaningful and productive process of government. One must maintain perspective on a broad provision such as this

legislative enactment, in its application to the actual workings of an active Board fraught with many and varied problems and demands.

I would also reiterate my belief in the act and the policy declared in it. The Florida Supreme Court in *Board of Public Instruction* v. *Doran*, 224 So. 2d 693 (Fla., 1969) articulated these views better than I can. The court said:

> The right of the public to be present and to be heard during all phases of enactments by boards and commissions is a source of strength in our country. During past years tendencies toward secrecy in public affairs have been the subject of extensive criticism. Terms such as managed news, secret meetings, closed records, executive sessions, and study sessions have become synonymous with "hanky panky" in the minds of public-spirited citizens. One purpose of the Sunshine Law was to maintain the faith of the public in governmental agencies. Regardless of their good intentions, these specified boards and commissions, through devious ways, should not be allowed to deprive the public of this inalienable right to be present and to be heard at all deliberations wherein decisions affecting the public are being made.

In *Adler* v. *City Council*, 184 Cal. App. 2d 763, 7 Cal. Rptr. 805 (1960), I find this appropriate language:

> It seems quite evident that the language of the Brown Act was not directed at anything less than a formal meeting of a city council or one of the city's subordinate agencies. If it were, no practical line could be drawn. The members of the planning commission and the city council (whether the full number or only two or three members) would be impeded in conducting informal discussions among themselves, thus exchanging information, would be handicapped in viewing property upon which they were about to legislate, would be unable to confer with real estate experts or with their planning director or with informed individuals having special qualifications to speak upon municipal problems.

I must call attention to the fact that the meeting being discussed in *Sacramento Newspaper Guild v. Sacramento County Board of Supervisors*, 69 Cal. Rptr. 480, 263 Cal. App. 2d 41 (1968) included all of the county supervisors and several other county officials. The injunction issued applied only to a *majority* of the board, not less.

I must also point out that this judicial implementation of the act will subject far more persons to prosecution under the act than the General Assembly intended. It is at least arguable that there is a possibility that many acts of governing bodies and boards may be voided for causes over which a majority had no control.

I would reverse the circuit court judgment to the extent indicated.

If, however, the court would, it could modify the judgment of the trial court to limit it to the sustention of the position of appellees as to the particular meeting and to eliminate from it any declaratory judgment beyond that particular issue. In addition to the reasons previously given for so limiting our judgment in this case, there are others. Ark. Stat. Ann. § 34-2505 (Repl. 1962) permits a court to refuse to enter a declaratory judgment where the judgment would not terminate the uncertainty or controversy giving rise to the proceedings. In this respect the remarks of Dean Joe Covington, an advocate of liberal use of the procedure are appropriate. In his article, "Act 274, The Declaratory Judgment Act," 7 Ark. Law Review 306, 310, he said:

> In declaratory proceedings courts have been careful to limit the conception of a justiciable controversy to guard against mere advisory opinions and decisions on moot questions. To exclude consideration of issues under this category courts frequently state that an "actual controversy" is necessary. Some state statutes have a specific provision requiring an "actual controversy," but Act 274 has no such provision though there is a reference in Sections 4 and 5 to "uncertainty or controversy." Some cases have limited declaratory relief to instances of actual physical damage. It is true that there

must be a genuine controversy which is ready for judicial determination so that a judgment would at least serve to "remove an uncertainty" and would be of some practical assistance to the parties. The court may dismiss a petition on this ground when the plaintiff will not be endangered or forced to decide on action concerning asserted rights which depend upon some contingency which does not seem sufficiently likely to take place. Some courts have said there must be an actual controversy or "the ripening seeds of a controversy." A proceeding may be regarded as justiciable if a coercive cause of action has already accrued to one of the parties with respect to the issue, or if it is relatively certain that coercive litigation will eventually ensue between the same parties if a declaration is refused. It is strongly urged that "controversy" be given a liberal construction in accordance with the mandate to this effect found in Section 11.

It is clear that a cause of action in the conventional meaning of the term is not necessary for declaratory relief. "Cause of action" is a very elusive term, but in a sense the declaratory judgment statute may be regarded as enlarging the conception of a "cause of action" for it does permit suit on factual situations not heretofore justiciable.

Power of the courts to grant declaratory relief is specifically made discretionary in Section 5 of Act 274. It is there stated that the court may refuse to enter the judgment or decree if such a decision "would not terminate the uncertainty or controversy giving rise to the proceeding." This provision was included in the Uniform Act as a part of the established jurisprudence as a guide to the courts, indicating that the declaratory relief was not something to be literally followed, but that the court could exercise its judgment by dismissing petitions for declaratory relief when such relief would serve no useful purpose. Despite the broad language of the statute, this discretion should not be regarded as absolute. It should be limited to a determination of the usefulness of the judgment or decree. It may be regarded

as similar to the discretion of chancery courts in exercising equity jurisdiction. Dismissal of a petition for declaratory relief is subject to review on appeal and the appellate court should exercise its own judgment on the propriety of the refusal or grant of relief.

As an exercise of this discretion courts have shown a reluctance to hear declaratory petitions based on future rights. But some recent cases under a more liberal construction have granted relief under certain circumstances involving future rights where all parties who could claim an interest are represented and an actual controversy exists.

The courts definitely have the discretion to deny declaratory relief in proper cases. Prof. Borchard, perhaps the father of declaratory judgment procedure in the United States addresses this subject in the light of the section which appears as § 34-2505. In his work, Declaratory Judgments (2d Ed.), p. 304, et seq, he says:

The declaration will be refused where in the court's opinion it is inexpedient, for some reason outside the record, such as public policy, or where the question might be raised again in some other way or where it would be embarrassing in the operations of government. It may also be refused *where by laches or defaults or inequity the plaintiff has weakened his claim to relief,* or where it would result in possible injustice to third persons. *** It will be refused where it would be futile or useless under the circumstances, for example, where the one against whom it is made is privileged to escape its effects by some action within his own discretion. As already observed, it will be refused where it is superfluous, or where it is not practical for the court to reach a conclusion, e.g., the effect of a prospective structure, or where it will serve no practical purpose in terminating uncertainty or insecurity. Thus, it will not be made "in the air," or in the abstract, i.e., without definite concrete application *to a particular state of facts* which the court can by the declaration control and relieve and thereby settle the controversy. [Emphasis mine.]

He also says:

> This rule merely embodies the established Anglo-American practice in all jurisdictions and indicates both the practical and remedial scope and limitations of the relief. Yet the discretion granted, however wide and unlimited in appearance, is a judicial discretion, hardened by experience into rule, and its exercise is subject to appellate review.

> \*\*\* There is and there must be a broad discretion in determining whether a declaration will serve a useful purpose, but the many considerations which enter into this matter of policy should not be left exclusively to a lower court, but should be weighed by the court of appeal. The grant of equitable remedies is also generally a matter of discretion and policy, hardened by experience into rule; but it would hardly be thought proper for an appellate court to suggest that the propriety of or discretion in granting an equitable remedy should be left to the trial court, and would not be reviewed by an appellate court except for "abuse." Equally unsound is the suggestion in its application to declaratory judgments. \*\*\* But the appellate court in all cases must exercise its own judgment on the propriety of the refusal or grant and not rely on the judgment of the trial court. Otherwise the remedy is actually "abused."

If the court would exercise its discretion to modify the judgment to limit it as I have indicated, I would concur.