## CIRCUIT COURT OF THE CITY OF RICHMOND

American Civil
Liberties Union
of Virginia et al.

v.

Hunter B. Andrews et al.

September 19, 1991

Case No. HC-342-4

By JUDGE RANDALL G. JOHNSON

This case arises under the provisions of the Virginia Freedom of Information Act, Va. Code § 2.1-340 *et seq.* (the "Act"). Petitioners are the American Civil Liberties Union of Virginia, the Richmond Chapter of the ACLU, Common Cause of Virginia, and the directors of ACLU-VA and Common Cause. The respondents are thirteen members of the General Assembly.[1]

The petition alleges that the Act was violated on two separate dates. First, it is alleged that on December 28, 1990, the Senate Finance Committee, by prearrangement of its chairman, defendant Hunter B. Andrews, met at the private hunting lodge of one of its members, respondent Elmon T. Gray; that no notice was given of the meeting; and that it was closed to the public.

---

[1] Five other legislators who were originally named respondents were dismissed by order entered June 13, 1991, upon the parties' stipulation that they had not attended any of the meetings in question.

Second, the petition alleges that on February 20, 1991, the Senate delegation to the General Assembly's Budget Conference Committee held a meeting which was closed to the public and from which members of the press were physically prevented from entering. It is further alleged that on the same day, members of the House of Delegates delegation to the Budget Conference Committee held a similar meeting which was likewise closed to the public, and from which the press was also excluded. While the court has already sustained respondents' motion to strike petitioners' evidence with regard to the February 20 meetings, certain comments of petitioners' counsel reported in the press prompt the following additional observations about those gatherings.

At the hearing in this case which was held on July 17, 1991, petitioners presented evidence that some sort of gathering occurred on the 10th floor of the General Assembly Building at which at least two senators were present. Another gathering took place on the House of Delegates side with "some" delegates present. Because the Act defines "meeting" as a gathering of at least *three* members and because no witness was able to testify that at least three members were present at either of the February 20 gatherings, the court rules that petitioners had failed to carry their burden of showing that a meeting had occurred. The court understands that one of petitioners' counsel later suggested that such ruling imposed an impossible burden on the petitioners; that is, since the public was barred from the gatherings, it is impossible for anyone to say how many senators or delegates were present. And since it is impossible to say how many senators or delegates were present, petitioners can never carry their burden of proof in this type of case. Counsel's complaint is not valid.

This action was filed on March 26, 1991. In spite of the Act's requirement that the petition be heard within seven days of filing (§ 2.1-346.1), the parties jointly requested a later hearing date so that, among other things, pretrial discovery could be accomplished. The hearing was set for, and was held on, July 17, 1991. The court assumes that a part of petitioners' discovery consisted of deposing those persons, legislators and others, who were *known* to have been at the February 20 gatherings,

as well as those legislators who were members of the delegations which allegedly met, including the six conferees who are respondents to this action. The court further assumes that petitioners asked those persons the simple question: "Who was present at those meetings?" If so, and if there were three legislators present at either gathering, only by committing perjury, and also having their staff members commit perjury, could respondents avoid a finding that a meeting occurred on that date.[2] Consequently, the court in no way presented petitioners with any sort of impossible task. Rather, the court simply refused to ignore the basic rule of law that a party seeking to establish a fact has the burden of proving that fact. Petitioners failed to meet that burden here.

Turning now to the meeting of December 28, 1991, petitioners allege that the Act was violated in two ways. First, petitioners say that no notice of the meeting was given as required by § 2.1-343. Second, petitioners allege that the meeting was not "public" as also required by that section. Respondents concede that no notice of the December 28 meeting was given. They argue, however, that they are exempt from the Act's notice requirement. Respondents deny that the meeting was not "public."

As far as they are relevant here, the facts concerning the December 28 meeting are not much in dispute. By personal letter to each of the other fourteen members of the General Assembly's Senate Finance Committee, Senator Gray invited the members to a "holiday get-together" at his lodge in Chesterfield County. The entire invitation, which was typed on Gray's official Senate stationery, read as follows:

> I would like to invite you to join me and a few friends for a holiday get-together on December 28th, at my family's Deer Lodge in Chesterfield County. A map, with directions, is enclosed.
> We are planning to gather about 11:00 on the 28th. Please plan to dress casually.

---

[2] Of course, petitioners also could have called those same persons as witnesses at the July 17 hearing and asked that question. No such person was called.

I hope that you'll be able to come, and I'll look forward to seeing you. If I don't see you before then, I want to wish you and your family a very joyous holiday season.

Very sincerely yours,
/s/ Elmon
Elmon T. Gray

Ten members of the committee, along with seven committee staff members, attended the meeting. While the parties disagree on how "accessible" Gray's lodge is to the public, the evidence is that it is located approximately 100-150 yards off of Route 360 and that the road to the lodge is normally blocked by a gate. During the meeting, however, the gate was open. There was also at least one "No Trespassing" sign posted on the property.

At the meeting, the committee's staff made a presentation to the members about the state's budget, particularly as it would be affected by the current recessing and the need for "belt-tightening." The members asked questions of the staff, and the staff gave each member a handout listing budget options and alternatives, and on which the members were asked to give their individual priorities for funding -- a sort of "wish list." It was a meeting marked by free-flowing discussion, with apparently no finance matters relating to the state being off limits. In fact, one of the respondents specifically testified that the meeting was "calculated to fully inform the members of the Senate Finance Committee of the issues that were going to be confronted during the coming term" and that such meetings "were good because of the fact that we could discuss things freely." Tr. at 24. Indeed, it is patently obvious to the court that the December 28 meeting was conceived, planned, and conducted for the purpose of performing the business of the Senate Finance Committee of the General Assembly, and any argument to the contrary is simply ludicrous. This finding alone, however, is not dispositive of the issue before the court; that is, whether the Act was violated.

**Va. Code §** 2.1-343 provides, in pertinent part:

Except as otherwise specifically provided by law and except as provided in §§ 2.1-344 and 2.1-345, all meetings shall be public meetings, including meetings and work sessions during which no votes are cast or any decisions made. Notice including the time, date and place of each meeting shall be furnished to any citizen of this Commonwealth who requests such information.

Section 2.1-341 provides, again in pertinent part:

*"Meeting"* or *"meetings"* means the meetings including work sessions, when sitting physically, or through telephonic or video equipment pursuant to § 2.1-343.1, as a body or entity or as an informal assemblage of (i) as many as three members, or (ii) a quorum, if less than three, of the constituent membership, wherever held, with or without minutes being taken, whether or not votes are cast, of any legislative body, authority, board, bureau, commission, district or agency of the Commonwealth or of any political subdivision of the Commonwealth, including cities, towns and counties; municipal councils, governing bodies of counties, school boards and planning commissions; boards of visitors of state institutions of higher education; and other organizations, corporations or agencies in the Commonwealth, supported wholly or principally by public funds. *The notice provisions of this chapter shall not apply to the said informal meetings or gatherings of the members of the General Assembly.* (Emphasis added.)

Thus, while § 2.1-343 requires generally that all meetings be public meetings and that notice of all meetings be given to any citizen who requests it, that section specifically makes reference to exceptions "specifically provided by law." And § 2.1-341 specifically exempts from the Act's notice requirements "informal meetings or gatherings of the members of the General Assembly." Accordingly,

the court must first decide whether the meeting of December 28 was an "informal meeting." I conclude that it was.

Virginia's Freedom of Information Act came into existence in 1968. As originally enacted, it did not apply to the General Assembly or its committees. Indeed, Section 2.1-341, the current form of which is set out in part above, did not include "legislative body" in its definition of "meeting" or "meetings"; and § 2.1-345 specifically provided that the Act "shall not be applicable to deliberations of standing and other committees of the General Assembly . . . ." Section 2.1-341 also included the following language in the paragraph defining "meeting" or "meetings":

> Nothing in this chapter shall be construed as to define a meeting as a chance meeting of two or more members of a public body, or as an informal assemblage of the constituent membership at which matters relating to the exercise of official functions are not discussed.[3]

In 1977, the Act was amended to include the General Assembly in its coverage. Not only was "legislature body" added to § 2.1-341 as one of the entities covered, the exemption for standing and other committees of the General Assembly contained in § 2.1-345 was also deleted. At the same time, however, the legislature added the sentence to § 2.1-341 which provides that "[t]he notice provisions of this chapter shall not apply to the said informal

---

[3] After reading and rereading the above sentence many, many times, the court is convinced that it does not say what the legislature intended for it to say. In fact, the sentence makes absolutely no sense as it is written. By deleting the word "as" in two places and inserting it in another, however, the sentence makes perfect sense (insertion is emphasized and the deletions are indicated by "[ ]"): "Nothing in this chapter shall be construed as to define *as* a meeting [ ] a chance meeting of two or more members of a public body, or [ ] an informal assemblage of the constituent membership at which matters relating to the exercise of official functions are not discussed."

In any event, it is clear that from the very beginning, the Act was only meant to cover gatherings at which it was anticipated or planned that public business would be conducted.

meetings or gatherings of the members of the General
-Assembly" and rewrote the sentence discussed at note 3
above to read as follows:

> Nothing in this chapter shall be construed
> to make unlawful the gathering or attendance
> of two or more members of a body or entity
> at any place or function where no part of the
> purpose of such gathering or attendance is
> the discussion or transaction of any public
> business, and such gathering or attendance was
> not called or prearranged with any purpose of
> discussing or transacting any business of the
> body or entity.

It is apparent from the above chronology that even
before the General Assembly decided to include itself
in the Act's coverage, it recognized three distinct types
of gatherings among public officials: (1) formal meetings;
(2) informal meetings; and (3) gatherings whose purpose
is not to discuss or transact any public business and
which are not called or prearranged for the purpose of
discussing or transacting any public business. Both before
1977 and now, the third category of gatherings -- those
whose purpose is not to discuss or transact any public
business and which are not called or prearranged for the
purpose of discussing or transacting any public business
-- were not, and are not, covered by the Act. Both before
1977 and now, formal *and* informal meetings of all public
entities *other than* the General Assembly were, and are,
equally subject to the Act, there being no distinction
between formal and informal meetings as to notice require-
ments or anything else.

In 1977, things changed. The General Assembly placed
itself and its committees under the Act's coverage. In
doing so, the legislature placed itself on an equal footing
with all other public entities subject to the Act with
regard to two of the three categories of gatherings just
mentioned. Specifically, the legislature made its *formal*
meetings, and those of its committees, subject to all
of the requirements -- notice and otherwise -- which apply

to all other public bodies subject to the Act.[4] By the same token, the legislature *excluded* from the Act's coverage gatherings of its members and of its committees' members, whose purpose is not to discuss or transact any public business and which are not called or prearranged for the purpose of discussing or transacting any public business, just as such gatherings of all other public officials were likewise excluded. The one difference which the General Assembly made for itself was with regard to the other type of gathering -- *informal* meetings. With regard to informal meetings of members of the General Assembly, "[t]he notice provisions of this chapter shall not apply . . . ." Thus, while the legislature has decided to treat its formal meetings and non-business gatherings of other public bodies, it has elected to treat its *informal* meetings differently. Specifically, while the informal meetings of all other public bodies subject to the Act must conform to the Act's notice requirements and other provisions, informal meetings of the General Assembly and its committees need not conform to the notice provisions of the Act. Once again, then, it all boils down to whether the December 28 meeting was an informal meeting.

Naturally, respondents argue that the meeting was informal. In fact, the committee's staff director testified that he did not consider the meeting to be a formal meeting. The court agrees with petitioners, however, that what respondents called their meeting is of little consequence. The old saw -- if it walks like a duck, looks like a duck, and quacks like a duck, chances are it *is* a duck -- is applicable here. If the December 28 meeting had the trappings of a formal meeting, was conducted like a formal meeting, and "looked" like a formal meeting, it was a formal meeting. We must look at the facts, then, to see whether it was.

The evidence shows that each year, a schedule of formal committee meetings is proposed by the staff director of the Senate Finance Committee and approved by the commit-

---

[4] Actually, it was not until 1989 that the precise words "committees or subcommittees" first appeared in the definitions section of the Act. It is clear to this court, however, that such committees and subcommittees were included even prior to the specific reference to them in Section 2.1-341.

tee chairman early in the year. That schedule is then sent to persons on the committee's mailing list; that is, all persons, press and public, who have asked to be given notice of meetings. Prior to the meetings, an agenda is prepared, including allocations of time to be devoted to specific topics and a list of speakers who will appear before the committee. Again, the agenda must be approved by the chairman. The committee members are then sent notices at the direction of the staff director reminding them of each upcoming meeting. The agenda is included with that notice. Also prior to the meeting, a notebook is prepared for each member containing any written material which will be used or referred to at the meeting. At the meetings themselves, all of the formal rules of procedure one might expect at a meeting of legislators are observed. The chairman gavels the meeting to order. The clerk calls the roll, or a staff member "notes" the roll. The agenda is followed throughout the meeting, with the chairman calling on the predesignated speakers to make their presentations. Members of the committee who wish to ask questions of a speaker must ask their questions through the chairman, committee rules prohibiting members from asking questions directly of a speaker. Significantly, none of these formal trappings were present at the December 28 meeting of the committee.

The meeting of December 28 was arranged through one of its members -- Senator Gray -- rather than through its chairman -- Senator Andrews. There was no agenda prepared prior to the meeting, nor was one handed out or followed during the meeting. No notebooks of written material were provided to the members, and there was no list of speakers to be heard. There was no gaveling of the meeting to order and no calling or "noting" the roll. Members were permitted to discuss all matters freely and could ask questions of staff members, who were the only speakers, without being recognized by the chairman or asking their questions through the chairman. No minutes were taken of the meeting, and no votes were cast. In sum, the meeting had practically no resemblance to formal meetings held by the Senate Finance Committee. While it is true that something that walks, looks, and quacks like a duck is probably a duck, something that does *not* walk, look, or quack like a duck is probably *not* a duck. The

court finds that the meeting here was not a formal one, and that, accordingly, respondents did not violate the Act by failing to give notice of it.

Petitioners set forth several arguments in opposition to the finding which the court has now made. First, petitioners argue that the intent of the legislature in enacting the Freedom of Information Act mandates a finding of coverage. This is so, according to petitioners, because of the Act's broad general policy of providing access by the public to the workings of government. Indeed, in commenting on the original policy statement set out in Section 2.1-340.1, the Supreme Court stated:

> [T]he whole tenor of the policy statement, Code § 2.1-340.1, militates [in favor of access]. The provision calls for "ready access," not limited access. Moreover, the provision states that even the enumerated exceptions and exemptions must be narrowly construed, while requiring that the disclosure provisions be liberally construed. We find it difficult to discern an implied exclusion from language which is designed to minimize the effect of explicitly stated exclusions. *Associated Tax Service v. Fitzpatrick*, 236 Va. 181, 187, 372 S.E.2d 625 (1988).

Section 2.1-340.1 was enacted in 1976. It originally read as follows:

> *Policy of chapter.* -- It is the purpose of the General Assembly by providing this chapter to ensure to the people of this Commonwealth ready access to records in the custody of public officials and free entry to meetings of public bodies wherein the business of the people is being conducted. This chapter recognizes that the affairs of government are not intended to be conducted in an atmosphere of secrecy since at all times the public is to be the beneficiary of any action taken at any level of government. To the end that the purposes of this chapter may be realized, it shall be liberally construed to promote an increased awareness by all persons

of governmental activities and afford every opportunity to citizens to witness the operations of government. Any exception or exemption from applicability shall be narrowly construed in order that no thing which should be public may be hidden from any person.

Presently, it is subpart B of § 2.1-340.1 which sets out the policy of the Act:

B. This chapter shall be liberally construed to promote an increased awareness by all persons of governmental activities and afford every opportunity to citizens to witness the operations of government. Any exception or exemption from applicability shall be narrowly construed in order that no thing which should be public may be hidden from any person.

The change has no effect on the Supreme Court's pronouncement or on petitioners' argument.

While this court agreed with petitioners and the Supreme Court with respect to the laudable purposes of the Act, this court simply has no power to ignore or alter what the legislature has written. Indeed, it must be remembered that while the legislature took great pains in 1976 to set out its intent that the public be given "*every* opportunity . . . to witness the operations of government," (original § 2.1-340.1, emphasis added), the General Assembly was not even covered by the Act. Surely petitioners do not suggest that § 2.1-340.1's policy statement made the General Assembly subject to the act prior to 1977 in spite of the Act's failure to include "legislative bodies" in its coverage definitions and in spite of the specific exemption granted to committees of the General Assembly by § 2.1-345. Indeed, as petitioners properly concede, the General Assembly has an absolute right to exclude itself entirely from the provisions of the Freedom of Information Act, as have the legislatures in over a dozen other states. Petitioners' Amended Post-Trial Brief at 26. The fact that the General Assembly has not chosen to exclude itself totally, however, does not lessen the "partial" exclusion which *does* exist. The

Virginia legislature has chosen to exclude from the Act's notice requirements all of its, the Virginia legislature's, informal meetings. Nothing contained in the Act's policy statement, no matter how forcefully or broadly stated, can nullify that exclusion.

Next, petitioners cite several cases from other states in which it was held that meetings lacking all of the normal trappings of formal meetings were nevertheless formal meetings within the meaning of such states' respective Freedom of Information Acts. For example, in *Orange County Publications, Inc. v. Newburgh City Council*, 60 A.D.2d 409, 401 N.Y.S. 2d 84 (3d Dept. 1978), the court held that informal meetings were covered by the New York open meeting statute even though that statute, N. Y. Public Officers Law § 98, required the "formal convening of a public body for the purpose of officially transacting public business." Similarly, in *Kamlet v. Board of Education of Plainedge Union Free School District*, 91 Misc. 2d 1105, 399 N.Y.S. 2d 366 (Special Term 1977), the court held that planning meetings which the governing body called "informal" were covered despite the label. What distinguishes these and the other cases cited by petitioners from the case at bar, however, is that in none of the cases cited, so far as this court can determine, was the court faced with a statute which specifically excluded informal meetings from any of the requirements of its state's equivalent of the Virginia Freedom of Information Act. Indeed, in *Mayor of El Dorado v. El Dorado Broadcasting*, 260 Ark. 821, 544 S.W.2d 206 (1976), the court stated:

> The FOIA applies alike to formal and informal meetings[,] and since we are required to give the Act a liberal interpretation, we cannot agree with appellants that it applies only to meetings of officially designated committees. We can think of no reason for the Act specifying its applicability to informal meetings of governmental bodies unless it was intended to cover informal [and] unofficial group meetings for the discussion of governmental business as distinguished from those contacts by the individual member that occur in the daily lives of every public official. Any other construction would

obliterate the word 'informal' as applied to meetings and make it simpler to evade the Act than to comply with it. 544 S.W.2d at 207.

Unlike the version of the Act on the books in Arkansas and, apparently, the other states involved in the cases cited by petitioners, virginia's Act's notice requirement does *not* apply alike to formal and informal meetings of the General Assembly. It applies to the General Assembly's formal meetings only.[5]

Third, petitioners argue that a fair reading of the Act shows that the term "informal" in § 2.1-341 must mean only a "chance, impromptu, or other largely or wholly unstructured or unplanned meeting." Petitioners' Amended Post-Trial Brief at 17. As has already been seen, however, the General Assembly has specifically excluded from *all* of the Act's requirements for *all* public entities "gatherings or attendance of two or more members . . . at any place or function where no part of the purpose of such gathering or attendance is the discussion or transaction of any public business, and such gathering or attendance was not called or prearranged with any purpose of discussing or transacting any business of the body or entity." If, as petitioners suggest, the term "informal" refers only to chance, impromptu, or other largely or wholly unstructured or unplanned meetings, the language just quoted adequately excludes such meetings from the Act's coverage. The fact that the legislature did not leave it there is a clear and conclusive indication that something more was meant by the term "informal." Moreover, since a gathering whose purpose is *not* the discussion or transaction of public business, and which is *not* called or prearranged with such purpose in mind, is not a meeting at all, an informal meeting must be one whose purpose *is* the discussion or transaction of public business, and which *is* called

---

[5] See also, Marsh v. Richmond Newspapers, Inc., 223 Va. 245, 288 S.E.2d 415 (1982): "We have ascertained that every state has a statute similar in purpose to the Act, but that no two states have sought to achieve the desired result in precisely the same way. The Act differs from all others in certain respects, so that cases from other states construing their statutes are not helpful to us in our analysis." 223 Va. at 254.

or prearranged with such purpose in mind. Indeed, the court fully agrees with petitioners that the determination of whether a meeting is formal or informal must be made on a case-by-case basis, and that is precisely what the court has done here. Petitioners' argument that the December 28 meeting was not informal simply because public business was discussed, however, is not consistent with the language of the Act as just discussed.

Fourth, petitioners assert that the meeting of December 28 carried abundant "indicia" that it was a formal, structured meeting within the meaning of the Act. None of the factors mentioned by petitioners, however, is persuasive. Specifically, the fact that the meeting lasted three hours on a holiday weekend during bad weather means absolutely nothing with regard to the formal versus informal question. Nor does the fact that the staff director sent out invitations on Senator Gray's stationery. Indeed, since that is not the way committee meetings are usually announced (*see* p. 9 *supra*), a better argument is that Senator Gray's invitations are indicia of an *informal* meeting.

Several of petitioners' "indicia" involve allegations that the public's business was discussed at the meeting. As already noted, however, that fact does not show that a gathering is a *formal* meeting but only that it is a *meeting*. And the fact that travel expense reimbursement vouchers were made available to committee members, and even filled out and submitted by at least one member, also shows only that the members were engaged in public business, thus distinguishing the gathering from a chance or impromptu meeting not covered by the Act at all. It does not show that the meeting was formal.

The court has already discussed those indicia of formality which the evidence shows were lacking at the December 28 meeting. If one, or two, or maybe even three of those indicia were lacking, the court might well find that the meeting was formal. Thus, if there was simply no gaveling to order but all of the other formalities were observed, the meeting would probably be formal. The same is true for lack of a roll call or even the lack of an agenda. Where, however, *none* of the formalities of a normal Senate Finance Committee meeting are observed, this court simply cannot hold that the meeting was formal.

Lastly, petitioners argue that even if the December 28 meeting was formal within the meaning of the Act, at least some public notice must still have been given. This, again, is based on petitioners' argument that the policy of the Act must be given effect, and that even if the "notice requirements *of this chapter*" do not apply, the broad policy of public access still requires *some* notice. Petitioners' Amended Post-Trial Brief at 20 (citing Va. code § 2.1-341, emphasis in quotation by petitioners). This argument also fails.

In *Roanoke School Board v. Times-World*, 226 Va. 185, 307 S.E.2d 256 (1983), the Supreme Court considered whether a prearranged telephone conference call in which all members of a school board participated and discussed matters proper for an executive or closed session constituted a "meeting" within the purview of the Act.[6] In deciding such conference call was *not* a meeting, the Court stated:

> We are well aware of the salutary purposes of freedom of information laws, of the statutory requirement that such laws be liberally construed to promote their purposes, and that any exceptions from applicability be narrowly construed. However, there is no common-law right of the public or press to attend the meetings of governmental bodies. Therefore, in the absence of a statutory prohibition, there can be no legal or constitutional objection to a governmental body transacting certain business by means of a telephone conference call. If such a call is prohibited, the prohibition must be found in legislative enactment. It cannot be done by judicial fiat. 226 Va. at 191.

Just as there is no common law right of the public or press to *attend* the meetings of governmental bodies, there is also no common law right of the public or press to receive *notice* of such meetings. The only requirement

[6] At the time Times-World was decided, the Act did not contain Section 2.1-341's present language which specifically includes "sitting . . . through telephonic or video equipment" within the definition of "meeting."

of such notice is the requirement set out in the Act. Thus, except for the "notice requirements *of this chapter*" (Section 2.1-341), there is no notice requirement at all. Petitioners' attempt to create one is not valid.

Moreover, if this court did conclude that some form of notice other than the notice required by statute is required, what would that notice be? Would notice to the Richmond newspapers satisfy notice requirements in Roanoke? In Norfolk? In Fairfax? In Abingdon? Would notice to every major newspaper in the state satisfy notice requirements for persons who do not read newspapers? Would notice then have to be given to television reporters? If so, would notice to Richmond stations satisfy notice requirements in Roanoke? In Norfolk? In Fairfax? In Abingdon? What about radio? In asking these questions, the court is not trying to be facetious. The court is simply illustrating the danger of ignoring the Supreme Court's admonition in *Times-World* against creating additional requirements in the Act by "judicial fiat." It was inappropriate to do so with regard to telephone conference calls in *Times-World*, and it is inappropriate to do so with regard to notice requirements here.[7] Having lawfully excluded itself from what otherwise would have been the only requirement to give notice of its own informal meetings, the legislature cannot in this action be forced by petitioners, or this court. to give some other type of notice.

Finally, the court must decide whether the December 28 meeting, though informal, was a "public" meeting. This is so because while § 2.1-341 exempts informal meetings from the Act's notice requirements, neither that section nor any other provision of the Act exempts such meetings from § 2.1-343's requirement that "*all* meetings shall be public meetings . . . . " (Emphasis added.) The court finds that petitioners have failed to prove that the December 28 meeting was not a public meeting.

Section 2.1-341 defines "open meeting" or "public meeting" as "a meeting at which the public may be present."

---

[7] Of course, the General Assembly saw fit to amend the Act in 1989 so as to include telephone conference calls in the Act's coverage. It is free to amend the Act now to remove the informal meeting exclusion from the Act's notice requirements. The Act, however, cannot be amended by this court.

There is no evidence in this case that any member of the press or public was refused entry to Senator Gray's lodge or that any member of the press or public was told that he or she would not be allowed to come to the meeting if he or she wanted to. Petitioners, however, again make several arguments in support of their position that the meetings were not public. First, petitioners argue that the presence of a "No Trespassing" sign on Senator Gray's property meant that the meeting was not "legally accessible" to the public. There are two answers to this argument. First, there is no evidence that any member of the press or public attempted to go to the meeting but was prevented or discouraged from doing so by the presence of the sign. Second, the court is convinced that Virginia's no trespassing law, Va. Code § 18.2-119, could not be enforced against a member of the press or public who enters upon private land for the purpose of attending a meeting which Virginia law requires be open to the public. Indeed, while the court recognizes the obvious self-serving character of such testimony, both Senator Gray and Senator Benjamin J. Lambert, III, another respondent, testified that the press would not have been considered trespassers on Gray's property and would have been admitted to the meeting upon request. In the absence of evidence that members of the press or public were denied entry, the court cannot ignore that testimony, no matter how self-serving.

Next, petitioners argue that the meeting was not "practically accessible" to the public because no notice of the meeting was given and that it was held in a private lodge on private land away from where committee meetings are normally held -- sort of "off the beaten path." With regard to petitioners' notice argument, petitioners seek to get in through the back door what they could not get in through the front. Once again, the Act does not require notice of informal meetings of members of the General Assembly. Regardless of the reason petitioners want such notice given, it need not be given.

With regard to where the meeting occurred, the Act contains no prohibition concerning location. In fact, the definition of "meeting" or "meetings" set out in Section 2.1-341 contains the phrase "wherever held." Again, without trying to be facetious, the court wonders how it could effectively decide whether meetings are public or not

public based solely on location. Suppose Senator Gray's house was next door to the State Capitol. Would a meeting held there be public? What about a senator's house in the next block? Ten blocks away? Fifty? The possibilities are endless. As was true with the Act's requirement of notice, any tinkering with the definition of "public meeting" must be left to the legislature. The judiciary is not suited for it. Because there is no evidence that any member of the press or public attempted to attend the December 28 meeting and was prevented by respondents from doing so, the court cannot find that such meeting was one at which the public could not be present.

Finally, petitioners cite the case of *Manufacturers Hanover Trust Co. v. Koubek*, 240 Va. 276, 396 S.E.2d 669 (1990), to argue that the meeting of December 28 was not public. In *Koubek*, the Supreme Court held that a sheriff's sale conducted pursuant to Va. Code § 8.01-492 was not a public sale because two of the parties to the underlying action had agreed before the sale how much would be paid for the property and because the sale was held in a private hotel room instead of a public area of the hotel. That case is not controlling here.

The holding in *Koubek* was premised upon the notice requirement of § 8.01-492. Simply put, the Court concluded that because of the previously agreed-upon sales price and because the sale was not conducted in a public area of the hotel, the sale "failed to comply with the express terms of the stated *notice* and violated both the language and policy of the statute." 240 Va. at 282.[8] In the case at bar, as has now been stated several times throughout this opinion, there was no notice requirement. Accordingly, there was no violation of any "express terms of [a] stated notice." As this court interprets *Koubek*, it was the combination of a notice requirement *and* the location of the sale which rendered the sale "private." I simply do not read *Koubek* so broadly as to dictate a finding that meetings of public officials, where no notice of such meetings is required or given, are not public meetings within the meaning of Virginia's Freedom of Information Act simply

---

[8] The notice in Koubek stated that the property would be sold to the highest bidder.

because those meetings are held at private residences, even "secluded" hunting lodges as Senator Gray's lodge is alleged to be. Without a notice requirement, any similarity between this case and *Koubek* falls, and its holding has no effect here.

For all of the foregoing reasons, it is the holding of this court that respondents did not violate the provisions of Virginia's Freedom of Information Act with regard to the December 28, 1990, meeting of the Senate Finance Committee in either of the ways alleged by petitioners.