ARKANSAS GAZETTE COMPANY and
Ginger SHIRAS *v.* Fred M. PICKENS, Jr. et al,
Acting in Their Capacities as Members
of the Board of Trustees of the
University of Arkansas

75-6                                            522 S.W. 2d 350

Opinion delivered May 12, 1975

*Rose, Nash, Williamson, Carroll & Clay,* for appellants.

*Ray Trammell,* for appellees.

CARLETON HARRIS, Chief Justice. The sole question presented on this appeal is whether committees of the Board of Trustees of the University of Arkansas are required by the Freedom of Information Act to permit newspaper reporters to be present at meetings. Stated differently, are committees of a board which is itself subject to the provisions of that act exempt from such provisions because they are only subgroups?

The Board of Trustees of the University is composed of ten members, one of whom serves as chairman, and on November 2, 1973, prior to a meeting of the entire board, five trustees, acting as members of the Student Affairs Committee of the Board, met with the president, vice-president and the legal counsel of the University for the purpose of discussing a proposed rule change that would permit University students of legal age to possess and consume intoxicating beverages in University owned or controlled facilities at the Fayetteville campus.[1] Also present was the chairman of the board, who is an ex-officio member of all committees. Ms. Ginger Shiras, a reporter for the Arkansas Gazette, was present for the purpose of reporting events that transpired in a subsequent issue or issues of the aforementioned newspaper. When her presence was discovered, a majority of the members of the committee, acting upon advice of the University's legal counsel[2] that the Freedom of Information Act did not prohibit exclusion of the public and representatives of the press from committee meetings, voted to conduct the meeting in private, and Ms. Shiras was requested to leave. On December 1, a request by the attorney for the Gazette that a policy be adopted permitting press representatives to attend the meetings was forwarded by mail, but no action apparently was taken on the request. On December 14, 1973, a second

---

[1] A question concerning race relations also was discussed, complaints having been made by an organization of black students called B-A-D relating to incidents occurring during "Beat Texas Week."

[2] Counsel relied upon an opinion from the attorney general rendered on July 1, 1971, and it might be here stated that there is no contention but that the board acted in good faith; i.e., it considered its actions to be legal.

meeting of the Student Affairs Committee was held for the purpose of discussing the alcoholic consumption issue, at which time the same members were present. Ms. Shiras again attempted to attend the meeting for the purpose of reporting proceedings, but was told that the policy explained at the November meeting was still in effect and that the committee's meetings were closed to the press.[3]Ms. Shiras did attend a meeting of the full Board of Trustees later in the day.

Thereafter, appellants instituted suit in the Pulaski County Circuit Court against the Board of Trustees seeking a declaratory judgment relative to their rights under the Freedom of Information Act. After the filing of an answer and the taking of testimony, the court rendered an opinion finding that committees or subdivisions of governing bodies or boards, "functioning in the manner and for the purposes that committees ordinarily do" were not subject to the provisions of the Freedom of Information Act and judgment was entered to that effect and the complaint was dismissed. From such judgment comes this appeal.

For reversal, it is simply asserted that "committees composed of members of the Board of Trustees are required by the Freedom of Information Act to conduct public meetings."

The Freedom of Information Act of 1967 is codified as Ark. Stat. Ann. § 12-2801 — 12-2807 (Repl. 1968). The pertinent sections to this litigation are § 12-2802, the second paragraph of § 12-2803, and § 12-2805. The first mentioned section declares the public policy of the State as follows:

> "It is vital in a democratic society that public business be performed in an open and public manner so that the electors shall be advised of the performance of public officials and of the decisions that are reached in public activity and in making public policy. Toward this end, this act is adopted, making it possible for them, or their representatives, to learn and to report fully the activities of their public officials."

---

[3]Ms. Shiras had just been permitted to attend a meeting of the Legal Committee when the Student Affairs Committee gathered for its meeting in the same room.

This language was commented on in *Laman v. McCord,* 245 Ark. 401, 432 S.W. 2d 753, the first case interpreting any phase of the Freedom of Information Act (by this court) after its passage by the legislature. After pointing out that the city's contention that the Freedom of Information Act was a penal statute and accordingly required strict construction, was erroneous, we then said:

"In the act now before us the General Assembly clearly declared the State's public policy: 'It is vital in a democratic society that public business be performed in an open and public manner.' We have no hesitation in asserting our conviction that the Freedom of Information Act was passed wholly in the public interest and is to be *liberally interpreted* to the end that its praiseworthy purposes may be achieved." [Our emphasis].

This, then, is the approach that we shall take in determining the litigation now before us.

Paragraph 2 of § 12-2803 defines "public meetings" as follows:

" 'Public meetings' are the meetings of any bureau, commission or agency of the state, or any political subdivision of the state, including municipalities and counties, Boards of Education, and all other boards, bureaus, commissions or organizations in the State of Arkansas, except Grand Juries, supported wholly or in part by public funds, or expending public funds."

The manner of conducting public meetings is set out in § 12-2805, pertinent language to the present action reading as follows:

"Except as otherwise specifically provided by law, all meetings formal or informal, special or regular, of the governing bodies of all municipalities, counties, townships, and school districts, and all boards, bureaus, commissions, or organizations of the State of Arkansas, except Grand Juries, supported wholly or in part by public funds, or expending public funds, shall be public meetings."

It is the contention of appellees, which view was also taken by the trial court, that the language in the statutes just quoted refers only to the governing body as a whole, i.e., public meetings are only required when the *full* board meets, and committee or subgroup meetings are not covered in the Freedom of Information Act. Granted, the act does not specifically set out the word "committees" when it defines public meetings, and the question thus becomes whether the legislative intent was to encompass the subgroups of a board. Before proceeding further, perhaps it would be well to state that we attach no significance to one of the arguments advanced by appellants. It is pointed out in their brief that six members (including the chairman) of a ten-man board constitute the Student Affairs Committee; that this number likewise constitutes a majority of the board itself, and it is suggested that this circumstance permits the board to transact board business as a committee and thus (according to the view of the board) exclude the public from its meetings. It is also shown by tne evidence that two other board members, not members of the committee, came into the meeting room off and on at the November meeting, and one board member, not a committee member, endeavored to speak, or ask a question at the December meeting which was not permitted. These facts deserve no further comment, for the conclusion which we have reached in this case, hereinafter set out, is not in any manner predicated upon the number of board members constituting the Student Affairs Committee, and our decision would be the same if that committee were composed of a lesser number.[4]

We might also state that decisions from sister jurisdictions are of little help, since the several freedom of information acts over the nation vary from state to state,[5] have been amended from time to time, and the courts have taken

[4]It is interesting to note that, according to the testimony, the board works by committees (authorized by the act which created the University) as a means of promoting efficiency and saving time, the main reason being the last. The record reflects that there are ten standing committees, and it is difficult to see how, with so many members on one committee, that much time could be saved since committee appointments are duplicated.

[5]In Comment, "Open Meetings Laws: An Analysis and a Proposal", 45 Miss. Law Journal 1151, 1974, it is pointed out that only four states are without some type of open meetings legislation.

divergent views in interpreting these statutes. Actually, there is authority to support both sides in the present litigation.[6]

In *Berry* v. *Gordon*, 237 Ark. 547, 376 S.W. 2d 279, this court said:

"In the case of *Bailey* v. *Abington,* supra, this Court held that in construing legislation and Constitutional provisions, it is the duty of the courts to ascertain and give effect to the intent of the framers and to the people who adopted it, even though the true intention, though obvious, has not been expressed by the language employed when given its literal meaning; that the courts are confined to the real purpose and intention of the language rather than to the literal verbiage employed; that the reason, spirit, and intention of the legislation or Constitutional provision shall prevail over its letter; that this rule of construction is especially applicable where adherence to the letter would result in absurdity or injustice, or would lead to contradiction, or would defeat the plain purpose of the law; and that to afford such construction, courts must restrict, modify, enlarge, and/or transpose the expressed terms."

It clearly appears that the General Assembly, in referring to public meetings, attempted to "cover the field", using such language as "formal or informal", "special or regular", and we attach no particular significance to the fact that the word "committee" is not specifically enumerated; in other words, it was the intent of the legislature, as so emphatically set forth in its statement of policy, that "*public business* be performed in an open and public manner." [Our emphasis].

Where is the basic difference in the nature of the business conducted by the board and the committee? Both are dealing with public business — both are dealing with problems that confront the institution which they represent. In fact, it would appear that the principal difference is that the committee delves more into detail than the board. When

---

[6]Appellants cite and review cases from seven states and appellees cite and review cases from eight states, in some instances the parties referring to the same states.

the General Assembly used the expression "to learn and to report *fully* [our emphasis] the activities of their public officials", it meant not only the action taken on particular matters, but likewise the reasons for taking that action. Actually, public knowledge of the reasons can well result in a board decision being more acceptable or palatable; to the contrary, decisions rendered in secret, the reasons not being known, can well result in perhaps unjustified criticism of a board. Is not the public entitled to know *why* a board adopts certain rules or regulations? The "why" is the essence of the action taken.

Appellants assert in their brief that if the trial court's decision is upheld, "The Board of Trustees now has the tool to eviscerate the Freedom of Information Act. Controversial subjects can be dealt with at committee meetings. All of the board members are entitled to attend." We think there is merit in this contention. Board members can thus acquaint themselves with the issues involved in controversial subjects, hear those issues discussed and debated, and definitely form their conclusions without the particular issues being discussed at the board meeting at all. The concurring opinion by Chief Justice Adkins in the Florida case of *Jones* v. *Tanzler*, 238 So. 2d 91 (the court having decided the case by a short *per curiam*), is pertinent to this question. There, the Chief Justice stated that a parent body could divide itself into groups of small committees, each member of the committee thus having a chance to commit himself concerning a matter on which foreseeable action would be taken by the parent authority, and the public would have no opportunity to be heard. It was then pointed out that the action of the entire parent body in a public meeting would thus be only an affirmation of the various secret committee meetings that had been held.[7] This aspect of the situation was also commented upon by the court in *Bigelow* v. *Howze*, Fla. App., 291 So. 2d 645, where it was said:

"This court may take judicial notice of the fact that

---

[7]The Florida Freedom of Information Act, West's F.S.A. § 286.011, in referring to public meetings, mentions those *inter alia* "of any board or commission of any state agency or authority", the word "committee" *not* being included in the statute.

committee recommendations are often accepted by public bodies at face value and with little discussion."

What is a committee? According to The American Heritage Dictionary of the English Language (1969 Edition), a committee is:

"A group of people officially delegated to perform a function, as investigating, considering, reporting, or acting on a matter."

This definition fits the situation here at issue and it appears to us somewhat incongruous that a parent body cannot go into executive session (except for personnel matters) but its component parts (the committees) which actually investigate the complaints, and act on those complaints by making recommendations to the board, are at liberty to bar the public from their deliberations. Surely a part (of a board) is not possessed of a prerogative greater than the whole.

Of course, pertinent to our discussion in the instant litigation is the question, "Did the decision reached by the committee affect proposed rules for the student body?" To ask the question is but to answer it, for the committee made its recommendations to the board on the basis of its own investigation, and the board adopted that recommendation with but little discussion.[8] When a committee of a board

---

[8]The Chairman of the Student Affairs Cmmittee presented the report to the board, citing the (then) present regulation concerning the use of alcohol on campus, and then reading the committee's proposed regulation. The minutes then reflect:

"Dr. Miller moved, and Mr. Shults seconded, a motion that the new regulation be adopted. Dr. Kemp asked whether the regulation would be explained that the new regulation would only apply to the Fayetteville campus at this time. Mr. Shankle requested the new regulation proposed to be read aloud again. He asked clarification as to what areas it covered. Dr. Mullins explained that it applied only to students 21 years of age, or older, and their possible use of alcohol within the privacy of their dormitory rooms. There were comments concerning the effective date if the recommendation were to be adopted. In response to inquiries, Dr. Mullins pointed out that options would be available under which other students might choose to be housed in areas away from those where alcoholic use would be permitted. The motion was adopted."

meets for the transaction of business — this is a public meeting, and subject to the provisions of the Freedom of Information Act.

It is suggested 'by appellees that appellants are without standing to institute this lawsuit since Ark. Stat. Ann. § 12-2802 (the declaration of public policy heretofore referred to) provides that public business shall be performed in an open and public manner so that the *electors* shall be advised of the performance of public officials; that the complaint contains no allegation that either appellant is an elector, nor that either appellant has been appointed agent-representative of any electors. This is a surprising argument, and in our view, merits but little comment. In the first place, such an issue does not appear to have been presented to the trial court. In fact, the answer admits the allegations contained in Sections 1 and 2 of the complaint. The former section sets out that the Gazette is a corporation organized under the laws of the State of Arkansas and that Ms. Shiras is a resident of Pulaski County. The latter states that a justiciable controversy exists.

§ 12-2806 provides that any citizen denied rights granted to him under the Freedom of Information Act may appeal to the Pulaski County Circuit Court, but appellees assert that there is no showing that Ms. Shiras is a citizen, but only a resident. Of course, the. declaratory judgment act (Ark. Stat. Ann. § 34-2512 [Repl. 1962]) provides that the word "person" shall also mean, *inter alia*, a corporation of any character whatsoever, so there is no doubt but that appellants had standing, under the declaratory judgment act, to have their rights and status declared by the court. Without delving into the distinction between "resident" and "citizen" (which is most often synonymous), § 12-2805 (Freedom of Information Act) sets out very clearly:

> "The time and place of each regular meeting shall be furnished to *anyone* who requests the information. [Our emphasis].

> "In the event of emergency, or special meetings the person calling such a meeting shall notify the representatives of the newspapers, radio stations and television

stations, if any, located in the county in which the meeting is to be held and which have requested to be so notified of such emergency of special meetings, of the time, place and date at least two (2) hours before such a meeting takes place in order that the public shall have representatives at the meeting."

The only way that electors, citizens, or any other member of the public can receive full reports of what transpires in board or committee meetings is by information obtained from the news media. Without such reports, the Freedom of Information Act is without meaning. Of course, the public in general cannot take a trip to Fayetteville or Little Rock, or wherever else the board and its committees, may meet, in order to attend a session and learn what is being done. Necessarily, the information must be acquired from the sources mentioned. Really, the argument is so paradoxical that it defies analysis. At any rate, the language of the act, just quoted, makes clear that members of the news media are indeed interested parties, and we find no merit in the contention.

In concluding, we adopt the language of the Florida Supreme Court in *Board of Public Instruction of Broward County* v. *Doran*, 224 So. 2d 693, which succinctly, but accurately, sets forth our own views in the present litigation:

"Statutes enacted for the public benefit should be interpreted most favorably to the public."

Reversed.

It is so ordered.

FOGLEMAN, J., concurs.

JOHN A. FOGLEMAN, Justice, concurring. I concur in the result reached insofar as this particular case is concerned. But except for the circumstances of this particular case, I agree with the judge of the Circuit Court, the Attorney General and the Board of Trustees of the University.

I have no quarrel with the policy declarations in the Freedom of Information Act. A public well informed as to actions of officials on public business, and the decisions made by them is essential to maintaining public confidence in public institutions and in restoring it where it is lost or impaired. The provisions of the act are decidedly beneficial for that purpose and the legislation should be classified and construed as remedial in nature.

I do think, however, that reading into the act a requirement that all committee meetings are public meetings under the statutory definition is more than a liberal interpretation of the act. It is, in my opinion, an extension made by rhetoric rather than reason. In the definition of "Public Meetings" it would have been so simple to have added the word "committee" somewhere if the General Assembly had intended the act, in derogation of common law, to be so comprehensive. Not only did it carefully avoid this, none of the words used is broad enough to encompass a committee of a bureau, commission, agency, board or organization. No one thinks of any of these words, in their common acceptation, as meaning committee, where the committee has no authority to act for its parent organization. See *Adler* v. *City Council of City of Culver City*, 184 Cal. App. 2d 763, 7 Cal. Rptr. 805 (1960); *McLarty* v. *Board of Regents of the University System*, 231 Ga. 22, 200 S.E. 2d 117 (1973). When it does have such authority, it becomes the alter ego of the body itself, and in my opinion subject to the same requirements of the Freedom of Information Act as its parent board, commission, agency, bureau, organization or governing body and its meetings become, to say the least, informal meetings of the board. But there is no indication in this record that the committee involved here was given any such actual authority. Furthermore, I cannot subscribe to the view that either ultimate favorable board action on a committee recommendation or usurpation of authority by it to act in a matter not referred to it by the parent organization is evidence of implied authority. Neither can I agree that the evidence shows that board action upon committee recommendations in this situation is either automatic or ceremonial or perfunctory.

But I attach great significance to a factor the majority

considers insignificant. I agree with appellants that when a committee consists of a majority of the board itself, the committee can and, in all probability will, become the alter ego of the board, and its meetings, informal meetings of the board, particularly when any or all of the members of the board may attend. I cannot accept appellee's argument that the chairman is not a member of the committee, simply because of his ex-officio status. This simply means that he is a member of all committees by virtue of his office as chairman. Black's Law Dictionary, 4th Ed.

Until today's decision, the most extreme position regarding committee meetings appears to have been taken by Florida courts. In *Bigelow* v. *Howze,* 291 So. 2d 645 (Fla. App. 1974), where, I submit, the reach of judicial notice was overextended, as I feel it has been by the majority here, the result reached and the answer to the question actually posed there is not nearly so extreme as its language or the result here. In that case a county commission had appointed a committee consisting of two of its five members and the tax assessor to investigate and report on the ability of two firms to do a comprehensive reappraisal of real and personal property in the county. The county attorney was an ex-officio member of the committee. A complete quotation of the actual decision follows:

> We do not suggest that the committee cannot interview others privately concerning the subject matter of the committee's business or discuss among itself in private those matters necessary to carry out the investigative aspects of the committee's responsibility. Cf. *Basset* v. *Braddock*, Fla. 1972, 262 So. 2d 425. However, at the point where the members of the committee who are also members of the public body make decisions with respect to the committee's recommendation, this discussion must be conducted at a meeting at which the public had been given notice and a reasonable opportunity to attend.

> This court may take judicial notice of the fact that committee recommendations are often accepted by public bodies at face value and with little discussion.

Therefore, unless the decision making process of a committee composed of two or more members of the public body appointing the committee is made in public, the salutory objectives of the Sunshine Law will have indeed become clouded.

In *Board of Public Instruction of Broward County* v. *Doran,* 224 So. 2d 693 (Fla. 1969) the trial court injunction affirmed only prohibited meetings or conference sessions "at which a quorum is present". In *Town of Palm Beach* v. *Gradison,* 296 So. 2d 473 (1974), the committee involved was characterized by the Florida Supreme Court as a buffer to serve as the alter egos of the Town Councilmen to make tentative decisions guiding zoning planners and advising the Council as to their ultimate zoning ordinances. The court considered that much of the Council's administrative and legislative decisional zoning formulation authority had been delegated to the committee. Where this is the case, I would agree with the Florida court.

But the Florida Supreme Court has finally said that a careful rereading of its opinions and the act fails to support the contention that prior decisions compel public meetings for acts of deliberation, discussion and deciding, prior to and leading up to affirmative formal action. *Bassett* v. *Braddock,* 262 So. 2d 425 (1972).

It can be argued with considerable force that the result of the extension made here is an impediment to informal discussions and exchange of information among committee members, and consultation by them with experts or informed individuals having special qualifications to speak upon problems being investigated by the committee. There is an appropriate investigative and exploratory stage preceding many actions by governmental bodies and agencies. At this stage, it may be said there are advantages to the public in permitting preliminary discussions in which there can be greater freedom of expression without fear of benefitting special interests, harming reputations, inviting pressure from special interests, creating a public image of ignorance by searching questions, producing demagogic oratory, exposing disagreements of subordinates with policy determinations

they must administer, or "freezing" members into publicly expressed opinions they might well prefer to abandon. In such initial stages, it is well that much be done and said which is exploratory, experimental and hypothetical, and open meetings could prove to be an impediment to a free exchange of ideas of that sort. See Open Meeting Statutes: The Press Fights for the "Right to Know," 75 Harvard Law Review 1199, 1202, 1219 (1962).[1] The writer of that article, an advocate of the extension of Freedom of Information acts, demonstrates that a policy determination is involved in this language found at p. 1206:

> . . . .Whether the courts will construe less explicit statutes as applying to subordinate committes and agencies is problematical. Since such groups have no power to make governmental decisions and since their recommendations must be considered in open session by the parent body, the need for public meetings is less compelling; indeed, privacy may facilitate the gathering of information as well as preliminary discussion. But if in practice recommendations are adopted with only perfunctory consideration by the parent group, the public will be deprived of information about the actual process of decision. And since there seems to be no particular reason for leaving subordinate groups always free to meet in private, the preponderant interest in informing the public seems sufficient to justify their inclusion.

Likewise, an Ohio court has recognized the impossibility of satisfactory accomplishment of the desired freedom of discussion and exchange of ideas essential to clear understanding and thinking under a spotlight or before a microphone. *Dayton Newspapers, Inc.* v. *City of Dayton*, 28 Ohio App. 2d 95, 274 N.E. 2d 766 (1971).

Public policy matters are involved. Fundamentally, the legislative branch declares public policy. If the common law is to be changed by extension of the Freedom of Information Act to all committees of every public board, commission, agency, organization or governing body, it should be done,

---

[1] See also Comment, Access to Governmental Information in California, (Blum) 54 California Law Review 1650, 1651, 1655, (1966).

as it was in California and New Jersey, by the General Assembly. See *Sacramento Newspaper Guild* v. *Sacramento Co. Bd. of Supervisors*, 263 Cal. App. 2d 41, 69 Cal. Rptr. 480 (1968); Comment, *Access to Government Information* (Blum), 54 California Law Review 1650, 1653 (1966); *Wolf* v. *Zoning Board of Adjustment of Park Ridge*, 79 N.J. Super 546, 192 A. 2d 305 (1903). The great disadvantage in courts' attempting to declare public policy lies in the fact that attention is necessarily focused on the particular interests of the litigants. In contrast, the legislature has the advantage of having all perspectives presented and considered in making such determinations. This determination should have been left with the General Assembly where it belongs, both as a policy decision and as a change in the common law. Even the Florida Supreme Court has finally recognized the hazards of "judicial implementation." *Bassett* v. *Braddock*, 262 So. 2d 425 (1972).

To say the least, all the court needs to decide today is that the committee consisting of a quorum of the board, as its alter ego, is subject to the same requirements of the Freedom of Information Act as the parent board. Courts should decide cases, not controversies.

I also agree with the result as to the standing of appellants, but cannot embrace all the particular reasons given in reaching it. In view of the efforts of appellee to have affirmative relief and in the absence of any showing that the standing of appellants to bring the action was challenged in the trial court, it appears to me that the question was waived and is raised for the first time on appeal. This is not a defect, if it is one at all, that goes to subject matter jurisdiction, so it is tardily raised. To say the least, if the challenge had been raised in the trial court, it is entirely possible that it would have been met there. See *Sacramento Newspaper Guild* v. *Sacramento Board of Supervisors*, 263 Cal. App. 2d 41, 69 Cal. Rptr. 480 (1968).

I would reverse the circuit court judgment only to the extent indicated.