The Honorable Becky Lynn State Representative P.O. Box 450 Heber Springs, AR 72543
Dear Representative Lynn:
This is in response to your request for an opinion on the following questions:
 1. Are meetings between representatives of the City of Fairfield Bay (a second class city), and representatives of the Fairfield Bay Community Club (a nonprofit corporation), where a subject of discussion is the funding for the Fairfield Bay Department of Public Safety, open to the public under the Arkansas Freedom of Information Act?
 2. Does the word "published" in A.C.A. § 14-55-206 mean that the paper must be printed in the municipality to be the required legal publication for city ordinances?
You state, under your first question, that two members of the Community Club and their attorney met with the mayor, one alderman, and the city attorney. The issue to be resolved is whether this is a "meeting" for purposes of the Freedom of Information Act ("FOIA"), which applies to "all meetings, formal or informal, special or regular, of the governing bodies of all municipalities. . . ." A.C.A. § 25-19-106 (Repl. 1992).
Clearly, the city attorney is not a member of the city's "governing [body]." With regard to the mayor, although no court has addressed this precise question, it is my opinion that the mayor is most likely included in the "governing [body]" for purposes of the FOIA. The city's corporate authority is vested in the mayor and the city council (A.C.A. §14-42-102); and the mayor is ex-officio president of the council. A.C.A. § 14-44-107(a) (regarding cities of the second class). See also Gibsonv. City of Trumann, 311 Ark. 561, 562, 845 S.W.2d 515 (1993) (holding that the mayor is "an ex officio member of the council.")[1] The mayor presides at meetings of the city council, and he has a vote when his vote is needed to pass any ordinance. A.C.A. § 14-44-107(a).
Assuming, therefore, that the mayor is properly considered a member of the governing body under the FOIA, the question focuses on whether a meeting of two members of the governing body falls within the act's so-called "open meetings" requirement. This office has previously opined that the number of members in attendance is not dispositive in determining whether a "meeting" has occurred. See Op. Att'y Gen. 91-225, copy enclosed (opining that the FOIA applied when two city board members met to discuss a matter that would foreseeably be acted upon by the board). This conclusion was reached notwithstanding the suggestion, indicta, in El Dorado Mayor v. El Dorado Broadcasting Co., 260 Ark. 821,824, 544 S.W.2d 206 (1976), that the FOIA does not apply to "a planned meeting of any two members of the city council." The opinion noted the court's statement in Arkansas Gazette Co. v. Pickens, 258 Ark. 69, 73,522 S.W.2d 350 (1975), that the decision therein was "not in any manner predicated upon the number of board members. . . ." Op. Att'y Gen. 91-225
at 3. And it noted the emphasis in Pickens upon the FOIA's policy statement that "public business be performed in an open and public manner." Id., citing Pickens, 258 Ark. at 74.
It should perhaps be noted in this regard that a recognized commentator on the FOIA has cited El Dorado Broadcasting, supra, as "the most authoritative judicial pronouncement to date" (J. Watkins, The ArkansasFreedom of Information Act 235 (2d ed. 1994)), and has concluded that "it apparently takes three members to make a meeting for FOIA purposes. . . ." Watkins, FOIA: Time for a Change, 44 Ark. L. Rev. 535, 610. Some confusion therefore exists as to how many members need be present to constitute an "informal" meeting under the FOIA. Id., 44 Ark. L. Rev. at 609-610. The potential for abuse by countenancing a series of discussions between two members is, however, apparent. And as noted in FOIA: Time fora Change, supra, the Arkansas Supreme Court "has been alert to means of circumventing the FOIA." 44 Ark. L. Rev. at 611.
While it therefore continues to be my opinion that no line should be drawn based on the number in attendance (see Op. 91-225), and that the attendance of two members could therefore constitute a "meeting" under the FOIA, a conclusive resolution of this question may require resort to the courts.
With regard to your second question, the mere fact that a newspaper is not printed in the municipality is not, in my opinion, determinative of whether it is "published" therein for purposes of A.C.A. § 14-55-206
(Cum. Supp. 1993), which states in relevant part:
 (a)(1)(A) All bylaws or ordinances of a general or permanent nature and all those imposing any fine, penalty, or forfeiture shall be published in some newspaper published in the municipality.
 (B) In municipalities in which no newspaper is published, written or printed notice posted in five (5) of the most public places designated by the governing body in an ordinance or minutes of the governing body shall be deemed a sufficient publication of any law or ordinance.
It is my opinion that if faced with the question, a court would most likely hold that the place of publication is not necessarily determined by the place of printing for purposes of this Code section. There is ample authority for this proposition in other jurisdictions. See
85 A.L.R. 4th 581 (1991). As noted in the American Law Reports annotation,supra, "[t]he creation and dissemination of a single edition of a newspaper involves a number of processes: gathering of news, solicitation of subscriptions and advertising, composition, editing, printing, mailing and other forms of delivery, and other business operations. . . ." 85 A.L.R. 4th at 588. While a fact question may arise, requiring a case-by-case determination regarding the place of publication, the predominant view appears to incorporate various other factors, in addition to or apart from the place of printing, such as the place where the paper is first put into circulation or first given to the public for circulation, and the paper's home office. Id. at 589.
In construing notice statutes requiring that the newspaper be published in the locality, the Arkansas Supreme Court has on several occasions refused to equate the term "published" with "printed." See Lewis v.Tate, 210 Ark. 594, 197 S.W.2d 23 (1946); Connerly v. Stephenson,181 Ark. 833, 28 S.W.2d 60 (1930); Drainage Dist. No. 9 of Miller Co. v.Merchants' Planters' Bank, 176 Ark. 474, 2 S.W.2d 1079 (1928). InDrainage Dist. No. 9, the court first noted that the word "printed" did not appear in the notice statute (176 Ark. at 478); it then cited cases from other jurisdictions regarding the place of publication as the place where the paper is first issued and intended for distribution. Id. at 479-480. The court distinguished the case of Wolf Bailey v. Phillips,107 Ark. 374, 155 S.W.2d 924 (1913), in essence finding substantial compliance with the drainage district notice statute, the object of which was to "give notice to that part of the public affected thereby. . . ."Id. at 479.
In Wolf Bailey, supra, the court held that a newspaper printed in one judicial district and having a circulation in another did not comply with a tax sale statute requiring publication in the district where the delinquent land was located. But the case may be explained by the fact that apparently there was a newspaper printed in the subject district with a bona fide circulation in the district. The legislative intent for the notice provisions to benefit the taxpayers (107 Ark. at 379) was thus accomplished by requiring that notice be published in the paper printed in the district.
It thus appears that the cases can be explained, in some part, by the court's recognition of legislative intent to make the substance of the notice "a public matter or known to the people in the city affected."Lewis v. Tate, supra, 210 Ark. at 599, citing Connerly v. Stephenson,supra, wherein the court held that "published" is not "altogether synonymous with the word `printed.'" 181 Ark. at 834. In this regard, it is significant to note that under § 14-55-206(a)(1)(A), if "no newspaper is published" in the municipality, notice may be posted in five public places. The posting of notice would presumably be an inferior means of notifying the citizenry of local bylaws or ordinances. The question may thus arise: What public purpose would be served by requiring the newspaper to be printed in the municipality? A reading of the cases in this area leads me to conclude that the answer to this question may well influence a court's interpretation of § 14-55-206.
This is not to say, however, that a paper is "published" for purposes of § 14-55-206(a)(1) in every place where it is circulated. The legislative history of § 14-55-206 manifests the legislature's awareness of a distinction between a newspaper's place of publication and its place of circulation. Prior to its amendment in 1993, § 14-55-206(a)(1)(A) required that bylaws or ordinances "be published in some newspaper ofgeneral circulation in the corporation." See A.S.A. § 19-2404 (emphasis added). Act 295 of 1993, § 2, substituted "published in the municipality" for "of general circulation in the corporation." A.C.A. § 14-55-206
(Cum. Supp. 1993). This legislative history leads me to conclude that if faced with the question, a court would most likely find persuasive those cases from other jurisdictions which distinguish "publish" from "disseminate" or "circulate." See, e.g., Express Publishing, Inc. v. Cityof Ketchum, 114 Idaho 114, 753 P.2d 1260 (1988); Oklahoma JournalPublishing Co. v. City of Oklahoma City, 620 P.2d 452 (Okla.Ct.App. 1980); City of Plainfield v. Courier News, 172 N.J. 171, 369 A.2d 513
(1976). In these cases, local distribution of the paper was not alone deemed sufficient to constitute publication. In City of Plainfield,supra, the court rejected the premise that a newspaper is "published" in any community in which it operates a branch office for circulation, noting the legislature's evident desire to require publication in local papers with community ties. 369 A.2d at 521-522. See also Montesano v.Liberty Warehouse Co., 121 N.J. 124, 1 A.2d 462, 463 (1938) (noting that "it is likely that there is no municipality in which newspapers from some source do not circulate.")
In conclusion, therefore, the fact that a newspaper is not printed in the municipality will not, in my opinion, necessarily prevent it from being considered "published" therein under § 14-55-206. On the other hand, dissemination or circulation in the municipality will probably not alone suffice. The question of whether any particular paper is "published in the municipality" for purposes of § 14-55-206 will require a factual determination in each instance. In making this determination, courts have considered persuasive the location of the paper's principal or main office, where its form and content are determined. City of Ketchum andOklahoma Journal Publishing Co., supra.
With regard, specifically, to The Fairfield Bay News, it is my understanding that although the actual printing takes place in Heber Springs, all of the activities necessary to prepare and produce a camera-ready copy are performed in Fairfield Bay, where the principal office is located. While fact questions may arise, it appears that the paper is issued for distribution in the first instance in Fairfield Bay. These circumstances compel me to conclude that the paper is in all likelihood "published" in Fairfield Bay for purposes of § 14-55-206.
The foregoing opinion, which I hereby approve, was prepared by Assistant Attorney General Elisabeth A. Walker.
Sincerely,
WINSTON BRYANT Attorney General
WB:EAW/cyh
[1] Gibson involved a city of the first class. The statute regarding the mayor as "ex officio president of the council" (A.C.A. § 14-43-501) is, however, similar to A.C.A. § 14-44-107, governing cities of the second class.