David HARRIS *v.* CITY of FORT SMITH, *et al.*

CA 03-951

158 S.W.3d 733

Court of Appeals of Arkansas
Division II
Opinion delivered April 14, 2004

[Rehearing denied May 19, 2004.]

*Hodson, Woods, & Snively, LLP*, by: *Michael Hodson*, for appellant.

*Friday, Eldredge & Clark*, by: *R. Christopher Lawson*, for appellees.

WENDELL L. GRIFFEN, Judge. This case involves the Arkansas Freedom of Information Act, Ark. Code Ann. §§ 25-19-101 — 109 (Repl. 2002 & Supp. 2003), hereafter referred to as "FOIA." David Harris filed this FOIA action against the City of Fort Smith, Bill Harding (the city administrator), C. Ray Baker, Jr. (the mayor), and the members of the City's board of directors (the Board), contending that those defendants violated the FOIA when Harding engaged in a series of one-on-one conversations with individual Board members before he made a successful bid on real estate on behalf of the City at a public auction held in April 2002. The parties filed cross-motions for summary judgment based on facts that were essentially agreed. At the hearing on the cross-motions for summary judgment, appellant waived the remedy of rescission and limited his requested relief to an injunction prohibiting the City from engaging in such conduct in the future. The trial court entered judgment in favor of the City on its motion for summary judgment based on a holding that no FOIA violation occurred by the serial one-on-one conversations between Harding and the individual directors. We now hold that the serial conversations between Harding and the individual directors about a matter that involved a recommendation that the City submit a bid on the land constituted a "meeting" within the intent of the FOIA, for which the public was entitled to prior public notice. Thus, we reverse the decision by the trial court and remand the case for entry of a decree granting prospective injunctive relief and statutory attorney's fees pursuant to the FOIA.

*Factual History*

On April 5, 2002, Fort Smith Deputy City Administrator Ray Gosack submitted a memorandum to his superior, city administrator Harding, as follows:

> As you may know, Fort Biscuit Company located at Parker and South 5th Street has gone bankrupt. Its Fort Smith property is in foreclosure and will be sold by auction on April 18th.
>
> The availability of this property presents an opportunity to correct a long-standing problem with the truck route through that part of downtown. The truck route currently makes two 90E turns and a stop in the vicinity of the federal and county courthouses. The loud noises from these truck movements have caused problems when the nearby courtrooms are in use.
>
> Attached is a drawing which shows how Wheeler Ave. could be realigned into South 5th Street across the Fort Biscuit property. This is a very conceptual drawing and would need additional work if we proceed with the project. The realignment would help solve the truck route problem by reducing the turning and stopping/starting movements for trucks near the courtrooms. In order to construct this project, the city would have to acquire some of the Fort Biscuit property.
>
> Acquisition of the Fort Biscuit property would be somewhat unusual. The property will be sold at an auction. We understand the bankruptcy trustee will take bids on each tract individually and on all tracts. The trustee will then determine which option produces the greatest amount of proceeds.
>
> Acquiring this property through an auction creates some unusual challenges for the city.
>
> Normally, we seek formal board approval, including an offer price, before acquiring property. If we obtain formal board approval for acquisition of the Fort Biscuit property, the city won't be able to **competitively bid** for the property since our maximum offer would be public information.
>
> If the city bids, we'll also need to be prepared to bid for the purchase of all ____ tracts. The tracts not needed for the truck route project could be sold or used for another public purposes [sic].

If the city was the successful bidder on the project, the board would need to, be prepared to publicly approve the acquisition shortly after the acquisition date. Backing out of the bid after the auction would be very difficult and unfair to the seller.

Our purpose now is to gauge the board's interest in pursuing acquisition of the Fort Biscuit property for realignment of the truck route. Given the number of tracts involved, the board might find it useful to visit the site.

If the board is interested, we'll need to have some appraisal work performed to determine how much the city should offer for the property. We would then informally review a maximum offer amount with the board. We'd want to have the board's concurrence on a maximum offer amount before participating in the auction.

We'll contact you in the next few days to gauge your interest in this project. If you have any questions or need more information, please call me at 784-2204.

Over the course of several days after Gosack's April 5, 2002 memorandum to Harding, Harding conducted a series of one-on-one conversations with the mayor and each member of the Board during which he explained the importance of the property to the City and the City's practice of not bidding more than fifteen percent above the appraised value of property. During those conversations, Harding asked each Board member if he or she was "comfortable" with that bidding range on the land. Each responded positively. The parties stipulated that Harding did not speak with more than one Board member in the same conversation and that he spoke with all of the members. The record reflects that process as revealed by the following memorandum, dated April 16, 2002, from Harding to the mayor and the members of the Board:

This Thursday morning, April 18th, the Fort Biscuit property will be auctioned off to the highest bidders. The real estate portion of the auction is due to start at 11:00 am. [sic] We were able to speak to each of you over the last several days and the unanimous response was to go forward with an attempt to purchase the property as a means to alleviate some of the major problems associated with the existing truck route.

Since receiving the "go-ahead" from you we retained Calvin Moye to provide us an opinion as to the value of the real estate to be auctioned. Those values are reflected in the attachment in Tables 1 through 3.

We have no interest in purchasing tracts 1 and 2. Tracts 3 through 6 are going to be auctioned individually and then auctioned again as a group to determine the best return for the property owner. Tract 6 has no value to the city for the truck route issue and we have no intentions of bidding on tract 6 separately. We will be actively bidding on Tracts 3, 4 and 5 to secure the right-of-way for the project and to give us maximum opportunity for radius and right-of-way design. It is likely that we may have to bid again when tracts 3 through 6 are offered together as a package in order to protect our interest in tracts 3, 4, and 5.

As such we are asking for authority to bid up to the amount reflected in the Appraisal + 15% column, (tracts 3, 4, 5 and 6), in Table 3 of the attachment. As you can see the maximum exposure to the city is $1,099,688 or $1.1 million.

After you have had an opportunity to review the information I will be in contact with you to determine your position on our recommendation.

Harding successfully bid on the property for $615,000, which was below the appraised value. On April 19, 2002, he sent another memorandum to the Board, stating:

On Thursday April 18th the Fort Biscuit property was auctioned by the Commissioner of the Court in Sebastian County Circuit Court. Having obtained permission from you in advance of the sale to bid on the property I attended the auction and successfully bid to acquire a portion of the real estate for the purpose of constructing a new alignment and certain other improvements to the downtown area truck route.

Tracts 3 through 6 on the attached locator map were purchased by the City for $615,000. The purchase price is approximately 2/3rds of the amount of the appraised value that the staff obtained prior to attending the auction. The manner in which the property was offered required the city to bid on more land than would be necessary to construct the truck route improvements. We anticipate selling off the surplus property to interested parties once the construction project needs have been identified. The attached locator map indicates a conceptual alignment of the reconstructed truck route. A considerable amount of additional review and analysis will be necessary in order to begin identifying the precise routing.

If the Board approves the confirming resolution, the property will be purchased with street sales tax funds. If approved, we plan to

begin immediately to conduct a Level 1 Environmental Impact Review on the buildings and other improvements that exist on the property. We will likely be approaching the Board in the very near future regarding a demolition plan for the buildings on the property as they have no value or utility to the City.

I respectfully request your approval of the attached resolution. Please contact me if you have any questions or need any additional information concerning this matter.

According to the parties, the City was required to post a bond securing the purchase by April 23, 2002. The Board was called into special session on April 23, 2002, to vote on the purchase, and the public was given notice of that meeting. Appellant attended the meeting and argued that Harding and the Board had violated the FOIA. At this meeting, the Board voted to approve the purchase of the property. Appellant then brought this action, contending that the FOIA's "open meetings" provision in Ark. Code Ann. § 25-19-106(a) (Repl. 2002) had been violated by Harding's series of one-on-one conversations with the members of the Board before the auction. Upon granting the City's motion for summary judgment, the circuit court held that Harding's one-on-one meetings with the members of the Board did not constitute a "meeting" within the terms of the FOIA. This appeal followed.

### The "Open Meetings" Provision of the FOIA

Our standard of review is well settled. On review of a case in which the facts are not in dispute, we simply determine whether the appellee was entitled to judgment as a matter of law. *National Park Med. Ctr., Inc. v. Arkansas Dep't of Human Servs.*, 322 Ark. 595, 911 S.W.2d 250 (1995).

Appellant argues that Harding's succession of one-on-one conversations with each member of the Board violated the "open meetings" provision of the FOIA. We agree. Arkansas Code Annotated section 25-19-106(a) (Repl. 2002) provides:

Except as otherwise specifically provided by law, all meetings, formal or informal, special or regular, of the governing bodies of all municipalities, counties, townships, and school districts and all boards, bureaus, commissions, or organizations of the State of Arkansas, except grand juries, supported wholly or in part by public funds or expending public funds, shall be public meetings.

By the express terms of this statute, the legislature made it crystal clear that even informal meetings, *i.e.*, those lacking the outward appearance of formal meetings, are subject to the FOIA. The Arkansas Supreme Court expounded on this subject in *Mayor & City Council of El Dorado v. El Dorado Broadcasting Co.*, 260 Ark. 821, 823-24, 544 S.W.2d 206, 207 (1976):

> In discussing informal meetings the Court in *Sacramento Newspaper Guild v. Sacramento County Board of Supervisors*, 69 Cal. Rptr. 480, 487, 263 Cal. App. 2d 41, 50 (1968) stated:
>
> > An informal conference or caucus permits crystallization of secret decisions to a point just short of ceremonial acceptance. There is rarely any purpose to a nonpublic pre-meeting conference except to conduct some part of the decisional process behind closed doors . . . .
>
> . . . .
>
> The Freedom of Information Act applies alike to formal and informal meetings and since we are required to give the Act a liberal interpretation, we cannot agree with appellants that it applies only to meetings of officially designated committees. We can think of no reason for the Act specifying its applicability to informal meetings of governmental bodies unless it was intended to cover informal but unofficial group meetings for the discussion of governmental business as distinguished from those contacts by the individual members that occur in the daily lives of every public official. Any other construction would obliterate the word "informal" as applied to meetings and make it simpler to evade the Act than to comply with it.

*Accord Arkansas Gazette Co. v. Pickens*, 258 Ark. 69, 522 S.W.2d 350 (1975).

■ The supreme court has also held that a series of telephone conversations can, in certain circumstances, constitute a "meeting" within the meaning of the FOIA. In *Rehab Hospital Services Corp. v. Delta-Hills Health Systems Agency, Inc.*, 285 Ark. 397, 687 S.W.2d 840 (1985), the court held that the FOIA was violated when the executive director of Delta-Hills conducted, without notice to the press, a telephone poll of most of Delta-Hills' executive committee about filing a motion for reconsidera-

tion of the Arkansas State Health Planning and Development Agency's issuance of a certificate of need to Rehab Hospital Services Corporation.

There can be no doubt that, in enacting the FOIA, the legislature intended that members of the public have notice of the actions of public officials responsible for conducting government business. Since the FOIA was enacted in 1967, it has been broadly construed in favor of disclosure. *Kristen Inv. Props., Inc., LLC v. Faulkner County Waterworks & Sewer Pub. Facilities Bd.*, 72 Ark. App. 37, 32 S.W.3d 60 (2000). The FOIA was passed wholly in the public interest and is to be liberally interpreted to the end that its praiseworthy purposes may be achieved. *Depoyster v. Cole*, 298 Ark. 203, 766 S.W.2d 606 (1989). The General Assembly enunciated those purposes in Ark. Code Ann. § 25-19-102 (Repl. 2002), which states:

> It is vital in a democratic society that public business be performed in an open and public manner so that the electors shall be advised of the performance of public officials and of the decisions that are reached in public activity and in making public policy. Toward this end, this chapter is adopted, making it possible for them or their representatives to learn and to report fully the activities of their public officials.

It is readily apparent to us that Harding's serial one-on-one conversations with each Board member to discuss the City's business were a subterfuge designed to circumvent the FOIA's public-disclosure requirements and that, through those conversations with its straw man (Harding) the Board held a "meeting" within the intent of the FOIA. Through Harding, the Board members unquestionably conducted the City's business; they agreed to bid on the property, settled on the maximum amount of the bid, and committed themselves to follow through with the sale in the event that the City's bid was successful. Unless the Board intended to purchase the property, there was no reason to obtain an appraisal or to permit Harding to place a bid on the property. In short, it is obvious that appellees' actions resulted "in a consensus being reached on a given issue, thus rendering the formal meeting held before the public a mere charade." John Watkins, *Arkansas Freedom of Information Act* 275 (3d ed. 1998).

To justify their actions, appellees offer several reasons why they attempted to keep the Board's authorization of the bid secret.

They argue that the City's ability to bid competitively at the auction would have been compromised if its intent to bid and the maximum amount of the bid had been publicly disclosed before the auction. They also assert that to forbid a city administrator from discussing city business with a single member of its board would create an "administrative nightmare."

In our view, these reasons are, at best, disingenuous. The FOIA does not contain an expediency exception, nor has it ever provided for government business of this nature to be conducted outside public view for the sake of administrative convenience. By no reasonable construction can the FOIA be read to permit governmental decision-makers to engage in secret deal-making on the ground that they are saving money. We are also unpersuaded that a stratagem of the nature employed by appellees must be used in order for the City to conduct its business. As for the purported need to keep the City's intent to bid and the maximum amount of that bid secret, we must point out that the FOIA not only protects the City's residents; it also protects those members of the public who might want to bid at such auctions. Whether one favors or opposes a prospective governmental decision, and no matter whether public disclosure will make the desired governmental action more or less difficult or expensive to undertake, Arkansas law is unmistakably clear. The people rule (*regnat populus*). They have a right to know, whether government officials find that knowledge convenient or not.

For these reasons, we reverse and remand this case with directions to the circuit court to enter an injunction prohibiting further violations of the FOIA by appellees and granting attorney's fees, as authorized by the FOIA, to appellant.

Reversed and remanded.

HART and GLADWIN, JJ., agree.