JUSTICE LEAPHART
dissenting.
¶39 I dissent.
¶40 I would apply the “functional analysis” that has been urged by amicus curiae State of Montana. Under that analysis, the Court should *205 distinguish between “fact-finding” efforts of state agencies and the “deliberative” process whereby state agencies with governmental authority reach substantive decisions. Although the Court, in conclusory fashion, states that the Senior Management Group was doing more than “fact-finding”-that it was “deliberating”-the Court does not develop a workable definition of “deliberative.” In my Anew, if the functional analysis is properly applied, we would conclude that the group is not a “deliberative” body as that term is used in the Montana Constitution, Article II, Section 9.
¶41 Commentators have divided the agency decision-making process into three stages: collective inquiry, deliberations, and decision. R. Berg & S. Klitzman, An Interpretive Guide to the Government in the Sunshine Act 9 (1978). Collective inquiry is triggered when an issue comes to the attention of the agency. Agency personnel and their staff gather information to define the issue, gather expertise and identify possible solutions Avithout comparing them. See, e.g., Arkansas Gazette Company v. Pickens (Ark. 1975), 522 S.W.2d 350, 357 (Fogleman, J. concurring) (“[tjhere is an appropriate investigative and exploratory stage preceding many actions by governmental bodies and agencies”). The so-called “fact-finding” stage includes seeking expert advice, creating study commissions, exploring issues or simply brainstorming. Berg & Klitzman, 9.
¶42 In contrast to the fact-finding stage, deliberation is “to think about deliberately and often Avith formal discussion before a final decision.” Webster’s Ninth Collegiate Dictionary (1991). The distinction between deliberative and fact-finding functions is best illustrated by contrasting our decisions in SJL of Mont. Assoc. v. City of Billings (1993), 263 Mont. 142, 867 P.2d 1084, and Great Falls Tribune Co., Inc. v. Day, 1998 MT 133, 289 Mont. 155, 959 P.2d 508. In SJL, the Billings Public Works Director, the Billings City Engineer and individuals representing a private contractor and a private engineering company met “to discuss the problems and concerns surrounding the delays in construction” on a street project in Billings. SJL, 263 Mont. at 144, 867 P.2d at 1085. Noting that Article II, Section 9, is designed to encompass government entities which are authorized “to make rules, determine contested cases or enter into contracts,” SJL, 263 Mont. at 147, 867 P.2d at 1087, we concluded that the meeting between the Billings officials and the private engineering company was not subject to the open meeting law requirements.
¶43 This is in contrast to the decision in Day, where the Director of the Department of Corrections appointed a Private Prison Screening *206 and Evaluation Committee and mandated that the Committee “deliberate” in order to make recommendations as to which specific contractor the Director should select. Day, ¶ 5. We concluded that the Committee was a public body and that the proposals which were submitted to it were public writings subject to public inspection. Day, ¶¶ 18-19. The State points out that the same public access requirements might not have held true for some sub-group of the Private Prison Screening and Evaluation Committee or staff assigned to gather information about private prison facilities in other jurisdictions or to accumulate and analyze information about the financial histories of various bidders. Such activities, falling short of a recommendation or a decision, would properly be categorized as “collective inquiry” or fact-finding.
¶44 The decision of the Maryland Court in Abell Publishing Co. v. Bd. of Regents (Md. Ct. App.1986), 514 A.2d 25, is instructive in the context of the present dispute. Dr. John Slaughter, Chancellor of the University of Maryland at College Park, appointed a task force charged with looking into “Academic Achievement of Student-Athletics.” The subcommittees of the task force refused to open their meetings to the public. Relying on the First Amendment and Article 40 of the Maryland Declaration of Rights, the Baltimore Sun sought a prohibitory injunction to prevent the subcommittees from holding closed meetings. The Sun contended that the task force was created by a rule, resolution or bylaw of the board of regents and that, since the board is a public body, the task force, as an arm of the board, was subject to the open-meeting requirements. In upholding the denial of the injunction, the court of appeals noted that Chancellor Slaughter had wide discretion in making policy decisions with respect to the campus and he was empowered to appoint task forces which report to him. The court found significant the fact that the task force was created by the chancellor, not the board of regents. The court held that meetings held by the subcommittees of the task force were not subject to the open meeting act.
¶45 In Bennett v. Warden (Fla. App. 1976), 333 So.2d 97, 100, the Court of Appeals of Florida held that the open meeting law did not apply to meetings between a college president and a group of junior college employees, called the Career Employees Council (CEC). The CEC members were designated by the president as representatives of the career employees for the purpose of discussing with him various problems and suggestions relating to employees’ working conditions in general and wages and hours in particular. The court held that the *207 president of the college is merely an executive officer of the board of trustees and is no different than any other executive officer of any other board, agency or commission of government. He was thus neither a “board” nor a “commission” within the ambit of the Sunshine Law. The court concluded that “frequent and unpublicized meetings between an executive officer and advisors, consultants, staff or personnel under his direction, for the purpose of ‘fact-finding’ to assist him in the execution of those duties, are not meetings within the contemplation of the Sunshine Law.” Bennett, 333 So.2d at 99. The court also observed that the president’s recommendations resulting from meetings with the CEC were made to an administrative council whose meetings are open to the public and that the recommendations of the council are submitted to the board of trustees for decision. Having noted that context, the court concluded that CEC is far too remote in the decision-making process to be capable of making or formulating policy or crystalizing decisions.
¶46 Although the Court here pays lip service to a distinction between deliberative decision-making and fact-finding, its conclusion that the Senior Management Group is a “deliberative” body does not withstand scrutiny. The Senior Management Group was not created by law, rule or regulation and thus has no legally imposed charge or mandate to decide anything. It has no definite membership and does not vote on propositions or take any direct action. Rather it is a group of upper-level university employees formed at the behest of the Commissioner of Higher Education with no specific charge to perform any function other than confer with the Commissioner. The Commissioner in turn makes recommendations to the Board of Regents, which, in open meetings, deliberates and makes final decisions. The management group is too far removed from the decision-making process to trigger the need for public access. Given that the Commissioner is free to disband the management group and dispense with any further meetings, it seems anomalous to hold that a group which has no collective authority, no constituent membership, and no legal obligation to meet in the first instance, must, if it does meet, give notice of its meeting, vote and maintain minutes pursuant to § 2-3-20 let seq., MCA.
¶47 The Court purports to set guidelines as to when meetings are required to be open to the public. These guidelines, however, are so broad that they provide no real guidance. First of all, the seven guidelines are addressed to when, where, and why “committees” meet. Although the Court does not define “committee,” it is apparent that *208 anytime any two public employees meet during office hours and discuss public matters, they constitute a “committee” engaged in a “meeting.” Thus an administrator of a state departmental division who voluntarily decides to hold periodic meetings of the division’s employees for the purpose of formulating recommendations to the department director would be bound to comply with open meeting laws. Likewise, when the Governor decides to meet regularly with a department head to discuss, for example, proposed legislation, such meetings would clearly fall within the guidelines and require public access. As the State points out, interagency gatherings, or “meetings,” occur literally hundreds of times each month across the State of Montana. By way of example, the State cites to ad hoc meetings among employees of the Environmental Management Bureau of the Permitting and Compliance Division of the Department of Environmental Quality and employees of the Minerals Management Bureau of the Trust Land Management Division of the Department of Natural Resources and Conservation meeting to discuss ongoing agency responsibilities and specific projects such as the progress of the preparation of an environmental impact statement for a proposed mining operation on school trust land.
¶48 The Florida Court noted in concluding that meetings between an executive officer and employees or advisors under his direction are not subject to open meeting requirements:
Any other conclusion, carried to its logical extension, would in our view unduly hamper the efficient operation of modern government the administra-tion of which is more and more being placed in the hands of professional administrators. It would be unrealistic, indeed intolerable, to require of such professionals that every meeting, every contact, and every discussion with anyone from whom they would seek counsel or consultation to assist in acquiring the necessary information, data or intelligence needed to advise or guide the authority by whom they are employed, be a public meeting within the disciplines of the Sunshine Law. Neither the letter nor the spirit of the law require it.
Bennett, 333 So.2d at 99-100.
¶49 Article II, Section 9, provides that no person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions. I interpret “deliberations” to mean the process by which a public body, legally charged with the duty or discretion to make a decision or *209 recommendation, reaches a decision. I do not interpret “deliberative” “public body” as encompassing a management group with no enabling law, rule or order, with no defined membership, with no charter or mandate, and which does not vote on propositions and has not taken any direct action such as adopting a formal policy.
¶50 Clearly, the Constitution guarantees the public access to the “deliberative” process whereby public agencies with governmental authority make decisions. See Great Falls Tribune (Director of the Department of Corrections delegated authority to Screening Committee) and Common Cause v. Statutory Committee (1994), 263 Mont. 324, 868 P.2d 604 (duties, size and membership of nominating Committee dictated by statute). The Court, however, needs to meaningfully define “deliberative” in such a manner that the open meeting requirements (quorums, minutes, voting and advance notice, §§ 2-3-202 and -212, MCA) are not counterproductively imposed on administrative or fact-finding meetings of public agencies. In deeming this ill-defined, amorphous Senior Management Group a “deliberative” decision-making body subj ect to open meeting requirements, the Court is creating more, not less, confusion.
¶51 I would reverse the decision of the District Court.
CHIEF JUSTICE GRAY joins in the dissent of JUSTICE LEAPHART.